**POLAROID CORPORATION, Plaintiff-Appellant,**

v.

**POLARAD ELECTRONICS CORPORATION, Defendant-Appellee.**

No. 162, Docket 26460.

United States Court of Appeals Second Circuit.

Argued Jan. 17, 1961.

Decided Feb. 28, 1961.

**493**

Donald L. Brown, Cambridge, Mass. (Silver, Saperstein & Barnett, and Isaac M. Barnett, New York City, Tracy R. V. Fike, Scarsdale, N. Y., and Herbert S. Kassman, Cambridge, Mass., on the brief), for plaintiff-appellant.

Morris Relson, New York City (Darby & Darby and Howard C. Miskin, New York City, on the brief), for defendant-appellee.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

Plaintiff, Polaroid Corporation, a Delaware corporation, owner of the trademark Polaroid and holder of 22 United States registrations thereof granted between 1936 and 1956 and of a New York registration granted in 1950, brought this action in the Eastern District of New York, alleging that defendant's use of the name Polarad as a trademark and as part of defendant's corporate title infringed plaintiff's Federal and state trademarks and constituted unfair competition. It sought a broad injunction and an accounting. Defendant's answer, in addition to denying the allegations of the complaint, sought a declaratory judgment establishing defendant's right to use Polarad in the business in which defendant was engaged, an injunction against plaintiff's use of Polaroid in the television and electronics fields, and other relief. Judge Rayfiel, in an opinion reported in D.C.1960, 182 F. Supp. 350, dismissed both the claim and the counterclaims, concluding that neither plaintiff nor defendant had made an adequate showing with respect to confusion and that both had been guilty of laches. Both parties appealed but defendant has withdrawn its cross-appeal. We find it unnecessary to pass upon Judge Rayfiel's conclusion that defendant's use of Polarad does not violate any of plaintiff's rights. For we agree that plaintiff's delay in proceeding against defendant bars plaintiff from relief so long as defendant's use of Polarad remains as far removed from plaintiff's primary fields of activity as it has been and still is.

The name Polaroid was first adopted by plaintiff's predecessor in 1935. It has

been held to be a valid trademark as a coined or invented symbol and not to have lost its right to protection by becoming generic or descriptive, Marks v. Polaroid Corp., D.C.D.Mass.1955, 129 F.Supp. 243. Polaroid had become a well known name as applied to sheet polarizing material and products made therefrom, as well as to optical desk lamps, stereoscopic viewers, etc., long before defendant was organized in 1944. During World War II, plaintiff's business greatly expanded, from $1,032,000 of gross sales in 1941 to $16,752,000 in 1945, due in large part to government contracts. Included in this government business were three sorts on which plaintiff particularly relies, the sale of Schmidt corrector plates, an optical lens used in television; research and development contracts for guided missiles and a machine gun trainer, both involving the application of electronics; and other research and development contracts for what plaintiff characterizes as "electro-optical devices employing electronic circuitry in combination with optical apparatus." In 1947 and 1948 plaintiff's sales declined to little more than their pre-war level; the tremendous expansion of plaintiff's business, reaching sales of $65,271,000 in 1958, came after the development of the Land camera in 1948.

Defendant was organized in December, 1944. Originally a partnership called Polarad Electronics Co., it was converted in 1948 into a New York corporation bearing the name Polarad Television Corp., which was changed a year later to Polarad Electronics Corp. Its principal business has been the sale of microwave generating, receiving and measuring devices and of television studio equipment. Defendant claimed it had arrived at the name Polarad by taking the first letters of the first and last names of its founder, Paul Odessey, and the first two letters of the first name of his friend and anticipated partner, Larry Jaffe, and adding the suffix "rad," intended to signify radio; however, Odessey admitted that at the time he had "some knowledge" of plaintiff's use of the name Polaroid, although only as applied to glasses and polarizing filters and not as to electronics. As early as November, 1945, plaintiff learned of defendant; it drew a credit report and had one of its attorneys visit defendant's quarters, then two small rooms; plaintiff made no protest. By June, 1946, defendant was advertising television equipment in "Electronics"— a trade journal. These advertisements and other notices with respect to defendant came to the attention of plaintiff's officers; still plaintiff did nothing. In 1950, a New York attorney who represented plaintiff in foreign patent matters came upon a trade show display of defendant's television products under the name Polarad and informed plaintiff's house counsel; the latter advised plaintiff's president, Dr. Land, that "the time had come when he thought we ought to think seriously about the problem." However, nothing was done save to draw a further credit report on defendant, although defendant's sales had grown from a nominal amount to a rate of several hundred thousand dollars a year, and the report related, as had the previous one, that defendant was engaged "in developing and manufacturing equipment for radio, television and electronic manufacturers throughout the United States." In October, 1951, defendant, under its letterhead, forwarded to plaintiff a letter addressed to "Polarad Electronics Corp." at defendant's Brooklyn address, inquiring in regard to "polaroid material designed for night driving"; there was no protest by plaintiff. In 1953, defendant applied to the United States Patent Office for registration of its trademark Polarad for radio and television units and other electronic devices; in August, 1955, when this application was published in the Official Gazette of the Patent Office, plaintiff for the first time took action by filing a notice of opposition, which was overruled by the Examiner in April, 1957. Still plaintiff delayed bringing suit until late 1956. Through all this period defendant was expending considerable sums for advertising and its business was growing—employees in-

creasing from eight in the calendar year 1945 to 530 in the year ended June 30, 1956, fixed assets from $2,300 to $371,800, inventories from $3,000 to $1,547,400, and sales from $12,000 to $6,048,000.

Conceding that the bulk of its business is in optics and photography, lines not pursued by defendant, plaintiff nevertheless claims to be entitled to protection of its distinctive mark in at least certain portions of the large field of electronics. Plaintiff relies on its sales of Schmidt corrector plates, used in certain types of television systems, first under government contracts beginning in 1943 and to industry commencing in 1945; on its sale, since 1946, of polarizing television filters, which serve the same function as the color filters that defendant supplies as a part of the television apparatus sold by it; and, particularly, on the research and development contracts with the government referred to above. Plaintiff relies also on certain instances of confusion, predominantly communications intended for defendant but directed to plaintiff. Against this, defendant asserts that its business is the sale of complex electronics equipment to a relatively few customers; that this does not compete in any significant way with plaintiff's business, the bulk of which is now in articles destined for the ultimate consumer; that plaintiff's excursions into electronics are insignificant in the light of the size of the field; that the instances of confusion are minimal; that there is no evidence that plaintiff has suffered either through loss of customers or injury to reputation, since defendant has conducted its business with high standards; and that the very nature of defendant's business, sales to experienced industrial users and the government, precludes any substantial possibility of confusion. Defendant also asserts plaintiff's laches to be a bar.

The problem of determining how far a valid trademark shall be protected with respect to goods other than those to which its owner has applied it, has long been vexing and does not become easier of solution with the years. Neither of our recent decisions so heavily relied upon by the parties, Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 1960, 281 F.2d 755, by plaintiff, and Avon Shoe Co., Inc. v. David Crystal, Inc., 2 Cir., 1960, 279 F.2d 607 by defendant, affords much assistance, since in the Ritchie case there was confusion as to the identical product and the defendant in the Avon case had adopted its mark "without knowledge of the plaintiffs' prior use," at page 611. Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities— the court may have to take still other variables into account. American Law Institute, Restatement of Torts, §§ 729, 730, 731. Here plaintiff's mark is a strong one and the similarity between the two names is great, but the evidence of actual confusion, when analyzed, is not impressive. The filter seems to be the only case where defendant has sold, but not manufactured, a product serving a function similar to any of plaintiff's, and plaintiff's sales of this item have been highly irregular, varying, e. g., from $2,300 in 1953 to $303,000 in 1955, and $48,000 in 1956.[1]

---

1. Even the high figure, in 1955, amounted to little more than 1% of plaintiff's business.

Plaintiff also cites defendant's sale of bicycle headlights and other consumer products and defendant's patents for a radio automatic vehicle guidance system and an electronic auto headlight dimmer. However, the former business, conducted through a separate division, has been abandoned, and exploitation of the patents has not been instituted. Our

If defendant's sole business were the manufacture and sale of microwave equipment, we should have little difficulty in approving the District Court's conclusion that there was no such likelihood of confusion as to bring into play either the Lanham Act, 15 U.S.C.A. § 1114(1), or New York General Business Law, § 368–b, or to make out a case of unfair competition under New York decisional law, see Avon Shoe Co. v. David Crystal, Inc., supra, at page 614, footnote 11. What gives us some pause is defendant's heavy involvement in a phase of electronics that lies closer to plaintiff's business, namely, television. Defendant makes much of the testimony of plaintiff's executive vice president that plaintiff's normal business is "the interaction of light and matter." Yet, although television lies predominantly in the area of electronics, it begins and ends with light waves. The record tells us that certain television uses were among the factors that first stimulated Dr. Land's interest in polarization, see Marks v. Polaroid Corporation, supra, 129 F.Supp. at page 246, plaintiff has manufactured and sold at least two products for use in television systems, and defendant's second counterclaim itself asserts likelihood of confusion in the television field. We are thus by no means sure that, under the views with respect to trademark protection announced by this Court in such cases as Yale Electric Corp. v. Robertson, 2 Cir., 1928, 26 F.2d 972 [locks vs. flashlights]; L. E. Waterman Co. v. Gordon, 2 Cir., 1934, 72 F.2d 272 [mechanical pens and pencils vs. razor blades]; Triangle Publications, Inc. v. Rohrlich, 2 Cir., 1948, 167 F.2d 969, 972 [magazines vs. girdles]; and Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517 [radios, electric ranges and refrigerators vs. sewing machines and vacuum cleaners], plaintiff would not have been entitled to at least some injunctive relief if it had moved with reasonable promptness. However, we are not required to decide this since we uphold the District Court's conclusion with respect to laches.

Plaintiff endeavors to answer that claim on three grounds: (1) That defendant is barred from advancing the claim because defendant sought affirmative relief; (2) that the doctrine of laches does not apply in trademark and unfair competition cases insofar as the complaint seeks an injunction rather than damages; and (3) that the defense is not made out on the facts. We find no merit in any of these contentions.

(1) Plaintiff's first position rests upon a remark, quoted in the margin,[2] given as an alternative ground of decision in Southern Pine Lumber Co. v. Ward, 1908, 208 U.S. 126, 140–141, 28 S.Ct. 239, 246, 52 L.Ed. 420. Mr. Justice White does not explain what "in the nature of things" prevented the defendants there from asserting both that the attachment under which their title arose was valid and that in any event plaintiff was barred by laches from attacking it. To be sure, when both parties are aggrieved by the same facts and these became known to both at the same time, a defendant's demand for affirmative relief may be logically inconsistent with a claim on his part that the plaintiff is barred by laches from making a similar demand, see, e. g., Steenberg v. Kaysen, 1949, 229 Minn. 300, 39 N.W.2d 18; Charleston Library Society v. Citizens & Southern Nat. Bank, 1942, 201 S.C. 447, 23 S.E. 2d 362, although even in such a case it would seem that the effect was merely evidentiary and that a defendant ought

decision is not to be understood as dealing with plaintiff's rights if defendant should resume, or begin, activity along any of these lines.

2. "Besides, the contention as to laches disregards the considerations which in the nature of things must arise, when it is borne in mind that the defendants, who claimed title under the attachment proceedings, did not rest content with defending their alleged title, but made that title the base of an assertion of right to affirmative relief, since they substantially, by cross-petition, invoked such relief to maintain the validity of their title, and to obtain a cancellation of the trust deed upon which Ward relied."

not be precluded from taking alternative positions, F.R.Civ.Proc. 8(e) (2), 28 U.S. C.A. Moreover, here the circumstances as to the two parties are not parallel. Plaintiff seeks to prevent defendant's use of Polarad in the very areas where that name had been used to plaintiff's knowledge since 1946 or at least since 1950. In contrast, defendant makes no objection to plaintiff's use of Polaroid in the areas of optics, and photography which, so far as defendant knew until the Patent Office interference in 1955, were the only fields where plaintiff employed it. So far as our research has disclosed, the statement in Southern Pine has not been applied by Federal courts in trademark and unfair competition cases; on the contrary, where both sides failed to press their claims after knowledge of the facts, this Court has reached the conclusion, seemingly far more sensible, that both were barred, rather than that defendant had waived the defense by seeking cross-relief to which it was not entitled, Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 1936, 85 F.2d 46. Of the state cases cited by appellant only Bagby v. Blackwell, 1948, 240 Mo.App. 574, 211 S.W.2d 69, lies in the trademark and unfair competition field; we do not find it persuasive. The statement in Southern Pine seems to us to have been undermined even on its own facts by the provision in F.R.Civ.Proc. 8(e) (2) that "A party may also state as many separate claims or defenses as he has regardless of consistency * * *" *A fortiori* do we deem the statement inapplicable where, as here, the plaintiff had long known the circumstance underlying its demand for relief but defendant had not known those relating to its more limited counterclaim.

■ (2) For its second ground appellant relies on the statement in Menendez v. Holt, 1888, 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526, that "Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself." It con-

tends that such defeat can come only from conduct, such as in Landers, Frary & Clark v. Universal Cooler Corp., supra, 85 F.2d at page 49, giving a defendant justification for concluding that plaintiff had no objection to defendant's using its name. See McLean v. Fleming, 1877, 96 U.S. 245, 24 L.Ed. 828. However, the portion of the opinion in Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60, also relied on by appellant, which upheld the defense of laches with respect to the word "Hunyadi," indicated that Menendez v. Holt does not go so far as appellant claims, even when a portion of the marks and the products are identical. We need not explore just where the boundaries lie in such a case, for the Landers, Frary & Clark opinion itself and, even more clearly, Emerson Electric Manufacturing Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 1939, 105 F.2d 908, and Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 1943, 132 F.2d 822, 824–825, show the doctrine has no such reach as claimed when, as here, the goods are different. The distinctions are developed in Judge Learned Hand's classic opinion in Dwinell-Wright, where he explained that the Menendez rule applies only when "a newcomer invades another's market by the use of the other's mark," since then "every sale is a separate wrong." "If however the question comes up, not when the newcomer is actually competing in the owner's market, but * * * is selling goods which the owner has never sold, though they are like enough to make people think him their source, the determining considerations are different. The owner's only interest in preventing such a use of his mark is because he may wish to preempt the market for later exploitation, or not to expose his reputation to the hazard of the newcomer's business practices, or both * * * Here, as often, equity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing * * * The owner's rights in such appendant markets are easily lost; they must be asserted early, lest

they be made the means of reaping a harvest which others have sown."

■ (3) The previous summary of the facts shows how far plaintiff came from meeting this rigorous test. Plaintiff seeks to excuse its early inactivity on the ground that defendant's sales were small. But that is the very time when the owner of a mark ought forcefully to claim protection; "the scales of conscience and fair dealing" will tip far more readily for a plaintiff when a defendant will suffer little disadvantage by changing to another name. See Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D. N.Y.1913, 211 F. 189, 195. Moreover, even if plaintiff's inaction in 1945 and 1946 could be excused on the basis that defendant's activities were *de minimis* and that plaintiff might reasonably have expected defendant to fall by the wayside, an issue which we do not decide, the situation had surely changed by the year ended June 30, 1951, when defendant made $192,000 in catalog sales and $356,000 in sales under military contracts. Plaintiff would have us disregard the latter on the issue of its laches—just why we are not told—although it relies heavily on confusion by Federal purchasing agencies as part of its case on the merits. Plaintiff concedes that by 1952 defendant "had expanded its business from the design and construction of special apparatus on order, to include the manufacture and sale of television and other devices operable throughout the entire radio frequency band"; but plaintiff waited another four years before bringing suit. We find nothing to support plaintiff's assertion that defendant has further encroached on plaintiff's field since 1953; to be sure, defendant has trebled its business but not by moving away from its traditional area and into plaintiff's. As said in Valvoline Oil Co. v. Havoline Oil Co., supra, at page 195, "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for

and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question." True, what the court regarded as debatable there was the confusing qualities of the names rather than, as here, the identity of the product; but the principle applies with at least the same force. If defendant should move into new territory more closely related to optics and photography, different considerations as to laches as well as on the merits will, of course, apply.

Judgment affirmed.