SARATOGA VICHY SPRING CO., INC., Plaintiff-Appellant,

v.

Orin LEHMAN, Commissioner of Parks and Recreation of the the State of New York and Waters of Saratoga Springs, Inc., Defendants-Appellees.

No. 660, Docket 79–7671.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1980.

Decided June 5, 1980.

Oakes, Circuit Judge, dissented with opinion.

1038

Jay W. Seeman and Singer, Hunter, Levine & Seeman, New York City, submitted a brief, for plaintiff-appellant.

Robert Abrams, Atty. Gen., William J. Kogan, Asst. Sol. Gen., Lawrence J. Logan, Asst. Atty. Gen., Albany, N.Y., submitted a brief, for defendant-appellee Lehman.

Albert Holland and Howard & Holland, New York City, submitted a brief for plaintiff-appellee Waters of Saratoga Springs, Inc.

Before OAKES, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal concerns primarily the issue of timeliness of a trademark suit in the context of a claim of trademark abandonment.

### Facts

Saratoga Vichy Spring Co. produces a variety of soft drinks and mineral waters; one of its products, mineral water from a spring in Saratoga Springs, N.Y., has been produced since 1876, almost always under the name "Saratoga Vichy." This name was registered with the U.S. Patent and Trademark Office in 1920, and continues to be protected under that registration. New York State began bottling mineral water from the Saratoga Springs area in 1910 under a variety of names, one of which is "Saratoga Geyser." Between 1910 and the commencement of the present suit in 1979, there was no litigation between the two bottlers. However, nearly 40 years ago Saratoga Vichy did bring suit in the Southern District of New York against a company marketing a product named "Saratoga Carlsbad Vichy." In granting relief to Saratoga Vichy, the District Court defined its rights as follows: "I do not hold that defendants may not use the word 'Vichy', or that they may not use the name 'Saratoga' in connection with their product, but I do hold that they may not use the combination together, 'Saratoga Vichy', which I find by long usage, exclusively by the plaintiff (since 1873), has acquired a secondary meaning." *Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp.*, 45 F.Supp. 260, 262 (S.D.N.Y.1942).

In 1971, the New York State legislature decided to eliminate its budget appropriation for the State's Saratoga bottling operation, which had become a losing venture, and to lease the facilities to a private producer.[1] When Saratoga Vichy learned of this decision, it wrote to the State, indicating an interest in obtaining the license, and stating: "We feel strongly that the water bottled at the Spa compliments [*sic*] our products in the sale of all Saratoga waters in the marketplace." However, the State became involved in litigation with its former distributor and was unable to obtain a licensee. During this period, it closed down the bottling operation and dismissed its employees, but it also filed an application for registration of the trademark "Saratoga Geyser" with the New York Department of State. The litigation with the distributor ended in 1976, and, two years later, the State reached a satisfactory license agreement with Waters of Saratoga Springs, Inc.,[2] which announced its intention to sell its product under the name "Saratoga Geyser."

At approximately the same time, 1978, Saratoga Vichy decided to revamp its mineral water product, abandoning its quaint

---

1. A major impetus for this decision was the discovery, in 1970–71, that several of New York State's mineral water products were partially radioactive. Not surprisingly, this had a somewhat detrimental impact on the sale of these products, which had been marketed as health items.

2. Shortly thereafter, it was discovered that the Geyser well, from which the State's "Saratoga Geyser" mineral water was drawn, was also somewhat radioactive, although not enough to render the product unsalable. As a result of this discovery, the State and Waters of Saratoga renegotiated their license.

image and developing a trendy new one in order to benefit from the dramatic success of Perrier mineral water in the United States. The company changed the name of its products from "Saratoga Vichy" to "Saratoga," adopted a new trade dress, and embarked on a one million dollar advertising campaign.

In 1979, when Saratoga Vichy learned that the State's license had been granted to Waters of Saratoga, it offered to buy the "Saratoga Geyser" trademark for $50,000. This offer was refused. Saratoga Vichy then brought this suit against both Waters of Saratoga and the State of New York, claiming infringement of its federal trademark, unfair competition and false designation of origin under the federal trademark act, infringement and dilution under New York trademark law, and unfair competition under the common law of New York. It argued that its use of "Saratoga" had acquired secondary meaning, that the State had abandoned any rights it may have had in its own mark, and that the actions of Waters of Saratoga were unfair according to both state and federal standards. The defendants argued that the suit was barred by laches, that the mark was not abandoned, and that its present use was not unfair.

The District Court for the Northern District of New York (James T. Foley, Chief Judge) granted summary judgment for the defendants.[3] We affirm. We hold that Saratoga Vichy's suit is barred by laches, as a matter of law, as to all alleged grounds of relief.

## Discussion

### The Laches Defense

It is often said that "mere delay" will not, by itself, bar a plaintiff's suit, but that there must be some element of estoppel, such as reliance by the defendant. See *Johanna Farms, Inc. v. Citrus Bowl, Inc.,*

468 F.Supp. 866, 880–82 (E.D.N.Y.1978); *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 322–23 (E.D.Pa.1976), aff'd in part, rev'd as to damages, sub nom. *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir. 1978); *Varsity House, Inc. v. Varsity House, Inc.,* 377 F.Supp. 1386 (E.D.N.Y. 1974) (applying New York trademark law); *Holiday Inns, Inc. v. Holiday Inn,* 364 F.Supp. 775, 783–84 (D.S.C.1973), aff'd mem., 498 F.2d 1397 (4th Cir. 1974); *Abbey Funeral Directors, Inc. v. Smith,* 24 Misc.2d 492, 204 N.Y.S.2d 439 (Sup.Ct.1960), aff'd mem., 14 A.D.2d 837, 218 N.Y.S.2d 527 (1961). All this means, however, is that a balancing of equities is required, which would be the case with any principle of equity. Adopting this view, Judge Weinfeld has offered the following rule: "Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Cuban Cigar Brands, N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978) (footnotes omitted).

The laches defense, as thus defined, is clearly available for all asserted causes of action: the federal trademark act, see *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 703–04 (2d Cir. 1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (defense rejected on facts); *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.) cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp.,* 105 F.2d 908 (2d Cir.) cert. denied, 308 U.S. 616, 60 S.Ct. 262, 84 L.Ed. 515 (1939), the New York law of unfair competition, see *Polaroid, supra; Hershey Ice Cream Co. v. Hershey Creamery Corp.,* 4 Misc.2d 812, 158 N.Y.S.2d 654 (Sup.Ct.1957),

---

**3.** The District Court found that as a matter of law the mark "Saratoga," as used by the plaintiff, had not acquired secondary meaning, that likelihood of confusion was too insubstantial to preclude summary judgment, that the plaintiff

was barred by laches, that the State had not abandoned its mark, and that the requirements for relief under the state statutes had not been met.

*aff'd mem.*, 5 A.D.2d 890, 173 N.Y.S.2d 254 (1958); *Renofab Process Corp. v. Renotex Corp.*, 158 N.Y.S.2d 70 (Sup.Ct.1970), and the New York trademark and anti-dilution statutes, see *Polaroid, supra; Rainbow Ranch Corp. v. Rainbow Shops, Inc.*, 89 Misc.2d 808, 392 N.Y.S.2d 796 (Sup.Ct.1977) (rejecting defense on facts); *Cue Publications Co. v. Colgate-Palmolive Co.*, 23 A.D.2d 829, 259 N.Y.S.2d 377 (Sup.Ct.1965); *Town Taxi Service Corp. v. Green Cab & Brokerage Co.*, 38 N.Y.S.2d 529 (Sup.Ct. 1943).

Saratoga Vichy argues that in trademark suits the defense of laches is not available to defeat equitable claims for an injunction, but only to defeat equitable claims for an accounting of profits. With respect to the federal law claims, this position has long been rejected; one leading example is a decision of the United States Supreme Court in favor of Saratoga Vichy itself. *French Republic v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903). For more recent rejections, see *Carl Zeiss, supra*, 433 F.2d at 703; *Cuban Cigar Brands, supra*, 457 F.Supp. at 1096; *Haviland & Co. v. Johann Haviland China Corp.*, 269 F.Supp. 928, 955 (S.D.N.Y. 1967). With respect to the state law claims, there is greater support for Saratoga Vichy's position. See *Cohn & Rosenberger Inc. v. Kaufman & Ruderman, Inc.*, 280 A.D. 241, 113 N.Y.S.2d 62 (Sup.Ct.1952); *Columbia Records, Inc. v. Goody*, 278 A.D. 401, 105 N.Y.S.2d 659, 665–66 (Sup.Ct.1951); *Tiffany & Co. v. Tiffany Productions, Inc.*, 147 Misc. 679, 264 N.Y.S. 459 (Sup.Ct.) *aff'd per curiam*, 237 A.D. 801, 260 N.Y.S. 821 (1932), *aff'd mem.*, 262 N.Y. 482, 188 N.E. 30 (1933). But even with respect to New York law, the distinction is made only "in the absence of elements creating an equitable estoppel," *Cohn & Rosenberger, supra*, 280 A.D. at 241, 113 N.Y.S.2d at 63.

Saratoga Vichy acknowledges that any possibility of relief against use of the "Saratoga Geyser" trademark by New York State prior to 1971 was barred by Saratoga Vichy's failure to bring suit during the period between 1910 and 1971.[4] It claims, however, that after 1971 the State effectively abandoned its mark by closing the bottling facility and discontinuing its use of the mark for some seven years. This abandonment, Saratoga Vichy asserts, entitles it to bring this suit to prevent use of the mark "Saratoga Geyser" by Waters of Saratoga. However, the undisputed facts establish that Saratoga Vichy continues to be equitably precluded from asserting its claim herein.

In 1971, when the State closed its facility, Saratoga Vichy wrote the State a letter suggesting that it not only regarded the State's trademark as valuable, but that it regarded the continued existence of the State's product as beneficial to its own interests. During the next seven years, Saratoga Vichy continued to acquiesce as it had from 1910 to 1971, although it knew that the State was seeking a new licensee for a trademark that Saratoga Vichy had effectively accepted as valid. When the licensee was finally selected, Saratoga Vichy wrote to it and offered to buy the rights to its trademark for $50,000. While Saratoga Vichy seeks to characterize the final letter in this unsuccessful negotiation as an offer for a quit-claim, the fact remains that it took no action prior to that letter, if indeed it took any action prior to the present suit, that would indicate its opposition to use of the "Saratoga Geyser" trademark. To be sure, it is normally not necessary for any trademark owner to put potential infringers on notice in order to protect its rights. But here plaintiff had acquiesced in a previous use of an arguably infringing mark, and knew that this very mark, although temporarily out of use, was in the process of being revived. It should have taken some affirmative action to protect its rights against innocent parties who relied upon its prior acquiescence. A simple warning letter would have sufficed. In this case, there

---

4. In light of the *Saratoga Carlsbad* opinion, *supra*, it is highly unlikely that any suit of this kind would have been successful.

was no such warning; in fact there was an uncontradicted letter of encouragement. Despite unquestioned knowledge for seven years that the State was seeking a licensee to put the product, and the product's long-established trademark, back on the market, Saratoga Vichy did nothing.

Saratoga Vichy's conduct thus establishes more than "mere delay." The conduct of the State and Waters of Saratoga establishes both innocence and reliance, and therefore determines the balance of equities. The State's original inclusion of the term "Saratoga" in its mark was natural, given the fame of that area for mineral waters; there were apparently many products using that name at the time, and the State's decision cannot be regarded as an effort to copy or benefit from "Saratoga Vichy." When the State offered to sell its bottling operation, it naturally included the established trademark "Saratoga Geyser" in the sale, since the good will associated with this mark was a large part of the license's value. In this context, the registration of the trademark shortly after the State stopped operating its bottling plant was clearly designed to clarify its rights, in order to make the license it was offering more valuable. Waters of Saratoga understandably decided to retain this trademark when it bought the license; it can hardly be regarded as acting in bad faith for continuing to use the name it had acquired. When courts refuse to bar a suit on the basis of the plaintiff's "mere delay," they often do so because it would not be equitable to excuse a defendant who has been committing conscious fraud. See *DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499, 514 (1st Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976); *Holiday Inns, Inc. v. Holiday Inn, supra; Vaudable v. Montmartre, Inc.*, 20 Misc.2d 757, 193 N.Y.S.2d 332 (Sup.Ct.1959). In this case, however, there is nothing remotely resembling conscious fraud.

■ There is substantial evidence that the defendants, particularly Waters of Saratoga, relied upon plaintiff's conduct. Waters of Saratoga's decision to buy the license from the State was based on the availability of the trademark, as well as the availability of the facilities and the wells. It is sometimes said that the continued production and sale of an infringing product does not constitute reliance, see *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1368 (E.D.Pa.1972), *aff'd mem.*, 480 F.2d 917 (3d Cir. 1973). But the defendant's entry into a new business in reliance on plaintiff's acquiescence in the validity of the trademark about to be licensed is a different matter. In this case, Waters of Saratoga's reliance is sufficient to support its equitable defense against Saratoga Vichy's claims even if the "Saratoga Geyser" mark was not used for a period of time.

■ This conclusion offers no general defense to infringers scavenging in the graveyard of abandoned trademarks. Only special circumstances will support an estoppel in the face of a claim of non-use. The trademark owner must have acquiesced in the previous use of the mark, and must have actual notice that an effort is being made to resume its use through its sale to an innocent purchaser relying upon its continued validity. In the present case, all these circumstances were present; in addition, Saratoga Vichy wrote two letters indicating that it regarded the "Saratoga Geyser" mark to have continuing validity.

*The Trademark Defense*

Even if Saratoga Vichy's action were not barred by laches, the defendants in this suit would be entitled to summary judgment. Saratoga Vichy's trademark is "Saratoga Vichy," not "Saratoga." In fact, the *Saratoga Carlsbad* case held that "Saratoga," standing alone, was not the company's trademark, and implied that it, as a geographical term, could be freely used by others. 45 F.Supp. at 262. In order to claim that the mark "Saratoga Geyser" is an infringement, therefore, Saratoga Vichy must establish that the term "Saratoga" has acquired a secondary meaning that refers to its own product.

Although Saratoga Vichy now labels its products with the single word "Saratoga," it has done so only for a brief period of time, a few months prior to the initiation of this suit. The basis of its claim, however, is that it was the only beverage company producing products that used the term "Saratoga" (either alone or as part of its mark) between 1971 and 1978, and that this term is the natural abbreviation of the trademark it used for most of this period, "Saratoga Vichy." While this claim is open to some question, it is the sort of factual issue that normally precludes summary judgment.

■ In this case, however, Saratoga Vichy's claim, even if factually supportable, is insufficient as a matter of law. Even if Saratoga Vichy has rights in the name "Saratoga" because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired. See *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir. 1978) ("Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark."); *Speed Products Co. v. Tinnerman Products, Inc.,* 179 F.2d 778, 781 (2d Cir. 1949).

As a result of this rule, Saratoga Vichy could not successfully rely upon secondary meaning if Waters of Saratoga obtained a mark established prior to the earliest time when Saratoga Vichy's mark could have acquired secondary meaning. Unless the mark "Saratoga Geyser" was abandoned by non-use between 1971 and 1978, it would be indisputable that any secondary meaning of "Saratoga" was acquired by plaintiff after "Saratoga Geyser" came into use. Therefore, defendants' entitlement to summary judgment on the merits of the trademark defense depends upon whether the undisputed facts refute Saratoga Vichy's claim that the State's trademark was abandoned.

■ A threshold issue concerning the abandonment claim is the choice of governing law. State law governs the issue of abandonment insofar as that issue affects plaintiff's state law claim, but it is not clear whether federal or state standards govern the issue of abandonment of a nonfederal trademark that is asserted as a defense to a claim of infringement of a federal trademark. Since New York state law on the issue of abandonment, even if applicable, is not particularly well-developed, it is appropriate to apply federal law by analogy, with respect to both the state and federal claims. This is what the New York trademark statute's undefined use of the term "abandonment" suggests, see N.Y.Gen.Bus.Law § 367(4)(a), and what the few relevant cases imply, see *Neva-Wet Corp. v. Never Wet Processing Corp.,* 277 N.Y. 163, 13 N.E.2d 755 (1938); *Rockowitz Corset & Brassiere Corp. v. Madame Co.,* 248 N.Y. 272, 162 N.E. 76 (1928).

■ The federal standard for abandonment of trademarks is set forth in the Lanham Act, which provides: "A mark shall be deemed to be 'abandoned'—(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment." 15 U.S.C. § 1127 (1976). The statute thus requires two elements for an abandonment—non-use and intent not to resume use, and permits the first element, when established for a two-year period, to create a "prima facie abandonment." What the statute does not make clear is what "prima facie" means in this context. It could mean that non-use for two years always creates an issue of fact for the trier, or it could mean that non-use for two years creates a presumption of abandonment that disappears when rebutted by contrary evidence. The matter is complicated by the fact that the second element of abandonment, intent, is a mental state and as such might be thought to be always inferable from an objective fact like non-use. In this case, plaintiff has shown non-use for more than two years. On the other hand, defendants have presented undisputed facts

to rebut abandonment. New York's non-use was caused by the decision of the legislature to have the State withdraw from the mineral water business, and the State thereafter sought continously to sell the business with its good will and trademark. These facts are completely inconsistent with an intent to abandon the mark. Indeed, Saratoga Vichy does not even allege an intent to abandon. Thus, whether the matter is appropriate for summary judgment depends on whether the period of non-use only creates a rebuttable presumption that disappears in the face of contrary evidence or permits the trier to infer intent to abandon, despite contrary evidence.

■ We think "prima facie abandonment" as used in § 1127 means no more than a rebuttable presumption of abandonment. In the first place, abandonment, being a forfeiture of a property interest, should be strictly proved, see 1 J. T. McCarthy, Trademarks and Unfair Competition § 17.3 at 592–93 (1973), and the statutory aid to such proof should be narrowly construed. Moreover, though intent is always a subjective matter of inference and thus rarely amenable to summary judgment, the cases that have found no intent to abandon suggest that objective facts can satisfactorily explain non-use to the point where an inference of intent to abandon is unwarranted. And if those facts are undisputed and strongly probative, summary judgment is appropriate. As the Supreme Court has observed, "Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed." *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31, 21 S.Ct. 7, 12, 45 L.Ed. 60 (1900). See *Baglin v. Cusenier Co.*, 221 U.S. 580, 598, 31 S.Ct. 669, 674, 55 L.Ed. 863 (1911). And in *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 680, 58 CCPA 1172 (1971), the Court of Customs and Patent Appeals concluded that undisputed facts of record negated the "presumption" of abandonment from two years' non-use despite a contrary conclusion by the Patent Office Trademark Trial and Appeal Board.

■ We agree with Judge Foley that the undisputed facts of this case justify summary judgment for defendants on the issue of abandonment, and this conclusion means that the mark "Saratoga Geyser" continues to be valid from its original use in 1910, which predates any possible acquisition of secondary meaning for plaintiff's use of "Saratoga."

■ This resolves Saratoga Vichy's trademark claims under both state and federal law. Saratoga Vichy's state law unfair competition claim is also legally insufficient. This claim is based on the notion that the only finding necessary is that the defendant's action has been "unfair," as the trial judge interprets that term. New York law in this area is indeed flexible, but it is not that flexible. The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. See *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781–82 (2d Cir. 1964); *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 161 N.E.2d 197, 190 N.Y.S.2d 977 (1959); *Metropolitan Opera Association, Inc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (Sup.Ct.1950), aff'd per curiam, 279 A.D. 632, 107 N.Y.S.2d 795 (1951); accord, *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). Central to this notion is some element of bad faith. None is apparent in this case. Waters of Saratoga seeks to use the mark it bought, a mark that had been established by the seller. There is no averment of fact to indicate that it is attempting to capitalize on Saratoga Vichy's efforts by doing so. Consequently, this claim, like the trademark claims, is appropriate for summary judgment, even if Saratoga Vichy's suit were not barred by laches.

Affirmed.

OAKES, Circuit Judge (dissenting):

I am required to dissent from the majority opinion and would reverse the district court's grant of summary judgment for appellees on three of Saratoga Vichy's five claims—those for false designation of origin

under 15 U.S.C. § 1125(a), for unfair competition under New York common law, and for dilution of its mark or name under N.Y.Gen.Bus.Law § 368–d.

In appellees' summary judgment motions, they relied upon two facts: (1) that "Saratoga Vichy" rather than "Saratoga" was appellant's registered trademark and (2) that appellant did not dispute the State's use of some form of the name "Saratoga" on the State's mineral water products for more than sixty years, demonstrating either acquiescence in that use or laches on the part of Saratoga Vichy. Since the first of these assertions was not disputed, appellees were entitled to summary judgment on Saratoga Vichy's federal trademark infringement claim, 15 U.S.C. § 1114, and New York trademark infringement claim, N.Y. Gen.Bus.Law § 368–b; the mark "Saratoga" was never registered by Saratoga Vichy and the respective statutes apply only to *registered* trademarks. *See Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp.,* 45 F.Supp. 260, 262 (S.D.N.Y.1942). But in my view failure to register the mark "Saratoga" is insufficient, in and of itself, to defeat Saratoga Vichy's three other claims, *see Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 309 (2d Cir. 1972); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 541–42, 399 N.Y.S.2d 628, 630–31, 369 N.E.2d 1162, 1163–1165 (1977).

Saratoga Vichy's primary contention is that it obtained exclusive rights to use the name "Saratoga" on its sparkling water products during the period after 1971 when the New York state legislature deleted funds from the State's bottling operation. The argument is that the name "Saratoga" has acquired a secondary meaning associated exclusively with appellant's products since 1971, that the State abandoned through nonuse any rights it had in the name "Saratoga," and that use of "Saratoga" by the State or its licensee would generate confusion.

The district court in my view improperly placed the burden on Saratoga Vichy, in meeting the summary judgment motion, to make an affirmative showing in support of its allegations of secondary meaning and confusion even though appellees' supporting papers did not contest these allegations. Thus appellees as the moving parties have failed to meet their burden "to show initially the absence of a genuine issue concerning any material fact." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

The district court also held that Saratoga Vichy's claims were barred by laches and that its allegation of abandonment was met "by a showing of extraordinary circumstances which excuse nonuse." The court's discussion, however, ignored Saratoga Vichy's primary argument that its exclusive rights began only after 1971, and again improperly placed the burden on it to show harm in the absence of any showing of lack of harm.

The "extraordinary circumstances" cited by the district court to refute the allegations of abandonment are unpersuasive. The court found that the nonuse occurred because the state legislature made a "public policy determination" to delete funds—a decision "over which the defendants had no control." But since the state legislature cannot be considered an entity independent from the State's Commissioner of Parks and Recreation, the simple fact that the State made a considered business judgment to discontinue production cannot amount to an "extraordinary circumstance" sufficient to excuse any alleged abandonment. The allegation of abandonment was simply not met in the summary judgment papers.

The majority here does not base affirmance on the district court's determination that Saratoga Vichy failed to demonstrate secondary meaning or likelihood of confusion. Instead the assertion is that the "undisputed facts" support appellees' contentions that Saratoga has been guilty of laches and that no abandonment has occurred.

The majority does recognize that Saratoga Vichy's claims to exclusive use of "Saratoga" arise only after the 1971 closing of the State's bottling plant. The majority then attempts to show that Saratoga Vichy has been guilty of laches *since 1971* by "continu[ing] to acquiescence as it had from 1910 to 1971, although it knew that the

State was seeking a new licensee for a trademark that Saratoga Vichy had effectively accepted as valid." There is simply no showing, however, that the State was seeking a licensee for most of the period during which the bottling facility lay dormant, much less any showing that Saratoga Vichy "knew" of any such efforts. Indeed, the Commissioner's brief on appeal (page 10) indicates that the State was *not* in fact actively soliciting a licensee from the spring of 1972 until May of 1976 because it was involved in protracted litigation with its former distributor. And another two years went by before any deal was made with any licensee. All of this is corroborated by the fact that the State began to use the bottling facility as a university office annex beginning in January of 1973.

The majority apparently bases its view that Saratoga Vichy knew that the State was continually seeking a new licensee during the period on two letters. The first, dated April 27, 1971, states Saratoga Vichy's own desire to take over the State's bottling facility. This letter was written *before* the State closed down its bottling operation and certainly cannot be interpreted to show either that the State was seeking a licensee between 1972 and 1976 or that Saratoga Vichy had any knowledge that such a search was taking place. The second letter, dated October 9, 1978, represents a proposal for Saratoga Vichy to pay appellee Waters of Saratoga Springs in return for conveying all of Waters' rights as the State's licensee to Saratoga Vichy for $50,000. I do not see how the majority can dispute the contention that this second letter merely represented an attempt to secure a quitclaim from appellees, an attempt which in these days of high legal expense surely legitimately was aimed at avoiding a lawsuit. The argument is made that Saratoga Vichy had some obligation to "warn" the State in the time between the two letters in 1971 and 1978 that it was no longer acquiescing in the State's right to use the "Saratoga" name. But the view that some warning was required, conceded to be "not normally necessary," is based on an apprehension I think mistaken that Saratoga Vichy was aware of some intention

on the part of the State to keep its mark alive during this period. And that the State registered the trademark "Saratoga Geyser" in New York on January 21, 1972, is immaterial. Even though that may have demonstrated the State's intention to continue using the mark *as of that date*, I do not see how it has any bearing on whether the State intended to preserve any rights it had to use "Saratoga" from 1972 to 1976.

In short, I do not believe that on this record Saratoga Vichy can be accused of sleeping on its rights *after 1971*. As long as the State had no competing product on the market and made no apparent attempt to license its product for a period of four years, Saratoga Vichy was not required to provide any warning to the State. Once the State licensed its product in 1978, after apparently waiting until 1976 to renew its search for a licensee, appellant took immediate action, first attempting to buy out the licensee and then bringing this lawsuit.

The majority's second conclusion that the "undisputed facts" demonstrate that there was no abandonment by the State suffers from the same infirmity as its laches discussion: I do not see those "facts" in the summary judgment record. Indeed, as already noted, appellees did not even seek to refute the allegation of abandonment in the summary judgment papers or Rule 10(e) statements. As the majority notes, appellant has made out a case of prima facie abandonment under 15 U.S.C. § 1127 by showing nonuse of the name "Saratoga" by the State for more than two consecutive years. The majority finds that this presumption has been rebutted, however, because after the State's plant was closed "the State . . . sought continuously to sell the business with its good will and trademarks." But as discussed in connection with the laches argument, I see in the record no showing of such a "continuous" attempt, and indeed the Commissioner impliedly concedes the opposite (Brief at 10). Nor does the failure of the complaint to allege "intent" to abandon on the part of the State lend support to the majority's conclusion. Under federal law, 15 U.S.C. § 1127, abandonment by definition means that use of the mark "has been discontinued

with *intent* not to resume." (Emphasis added.) Thus, the allegation of abandonment necessarily implies an allegation that there was intent to cease use of the mark. In any event, such a narrow interpretation of the complaint would be antithetical to the broad rules of federal pleading. *See* Fed.R.Civ.P. 8(f); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959); *New York State Waterways Association, Inc. v. Diamond,* 469 F.2d 419, 421 (2d Cir. 1972).

Since on the record below abandonment may well have occurred, summary judgment was inappropriate. If there were abandonment, the State may well have completely lost its right to use its mark again if Saratoga Vichy is correct that it "ha[d] acquired exclusive rights in the interim." 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 79.4, at 532 (3d ed. 1969). In my view, then, there remain disputed issues of material fact, resolvable only on trial absent a new showing by the appellees.