898 F.2d 147
 13 U.S.P.Q.2d 2025
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SEIDELMANN YACHTS, INC., d/b/a Pacemaker; J. Robert
Seidelmann, Plaintiffs-Appellees,
v.
PACE YACHT CORPORATION; Peter Tsou, Defendants-Appellants.
SEIDELMANN YACHTS, INC., d/b/a Pacemaker; J. Robert
Seidelmann, Plaintiffs-Appellants,
v.
PACE YACHT CORPORATION; Peter Tsou, Defendants-Appellees.
 Nos. 89-1043, 89-1048.
 United States Court of Appeals, Fourth Circuit.
 Argued: Sept. 14, 1989.
Decided: Feb. 23, 1990.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Joseph C. Howard, District Judge. (CA-87-3490-JH)
 Samuel D. Littlepage, Berman, Aisenberg & Platt, Washington, D.C., for appellants.
 Lewis T. Booker, Hunton & Williams, on brief: Lonnie D. Nunley, III, Hunton & Williams, Richmond, Virginia, for appellees.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Following a four-day non-jury trial, the district court entered a judgment for the plaintiffs-appellees on their claims of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. Secs. 1114 and 1125(a), and trademark infringement and unfair competition under the common law of Maryland. The trial court permanently enjoined the defendants-appellants from using the word and the mark "PACE" on or in connection with power boats, yachts and cruisers, but the court denied plaintiffs' claims for monetary damages and attorney's fees. The trial court found against the defendants on their counterclaims asserting fraudulent renewal of the PACEMAKER trademark, common law unfair competition and statutory unfair competition.
 
 
 2
 Defendants appeal, claiming error by the district court in finding that the trademark PACEMAKER had not been abandoned, and in finding that defendants' mark PACE would likely cause confusion with plaintiffs' mark PACEMAKER among an appreciable number of persons. We are persuaded that the district court's findings are not clearly erroneous, and we affirm.
 
 
 3
 * The history of the PACEMAKER trademark goes back to 1949 when C.P. Leek and Sons, Inc. (Leek) began using the name PACEMAKER on yachts and cruisers made in New Jersey. In 1960, Leek had the mark PACEMAKER federally registered as Federal Registration No. 704,203. Several years later Leek changed its name to Pacemaker Corporation, and in December of 1976 Pacemaker Corporation assigned this trademark and its federal registration to Mission Marine Associates, Inc. (Mission Marine), a California company.
 
 
 4
 Mission Marine acquired two boat lines from Pacemaker. One was the Pacemaker yacht and the other was known as EGG HARBOR BOATS. Several years later Mission Marine encountered financial difficulties unrelated to its Pacemaker Yachts. It filed for Chapter 11 bankruptcy in 1979 and ceased manufacturing yachts by August 1980. As a part of its plan of reorganization, Mission Marine held a public auction in December 1980 to sell tools, molds and other equipment. At this time, an unsuccessful effort was made to sell the PACEMAKER trademark and the assets associated with its Pacemaker yachts division as a single package. The sale was attended by the plaintiff Robert Seidelmann, who owned Seidelmann Yachts, Inc. (Seidelmann), which he had organized in 1976 as a sailboat manufacturing company. Although Seidelmann submitted bids on certain of the assets being sold by Mission Marine and bought some equipment and machinery, he did not buy the PACEMAKER trademark at that time.
 
 
 5
 During the month of the sale, the PACEMAKER trademark was due for renewal. While an official of Mission Marine renewed the trademark, the application listed erroneously Pacemaker Corporation as the owner of the mark and stated that the Pacemaker trademark is "still in use in interstate commerce on yachts and cruisers." John Van Dyke, an executive of Mission Marine, testified that for the next four and a half years his company searched for a purchaser for the PACEMAKER trademark, and eventually sold it in 1985 to the plaintiff for $5,000. This price included the federal registration, the logo, and good will.
 
 
 6
 In the summer of 1984, Seidelmann began manufacturing yachts of 26 to 31 feet in length using a set of Pacemaker molds belonging to George Favre, who had previously worked with Pacemaker boats and owned a set of Pacemaker-Wahoo molds. In marketing these yachts, Seidelmann advertised "Pacemaker is Back" and "Pacemaker ... a Tradition of Excellence." In April of 1985, Seidelman and Jeffrey Scocchio developed a plan of investment to purchase the molds of the Egg Harbor Boat Company, which were previously used by Mission Marine to build both Pacemaker and Egg Harbor Yachts. At a boat show in October of 1985, Mr. Seidelmann met with Peter Tsou in an effort to interest Tsou in making an investment in the manufacture of boats from the Egg Harbor molds and in possibly importing from Taiwan boats which would be manufactured using the Egg Harbor molds.
 
 
 7
 Defendant Tsou was in the import business and dealt primarily with products from Taiwan. During 1985-86, he imported some Taiwanese-made yachts under the trademark NAUTIQUE. There was a protest of this name by a third party, and the trademark was changed to NAUTIQUEST in April 1986. During the course of delivering one of the NAUTIQUEST boats for sale in New Jersey in early 1986, Tsou noticed a number of boat molds lying in varying states of deterioration on the property of Egg Harbor Boat Company. He entered into negotiations and acquired the molds for a price in excess of $175,000. These were the molds which Egg Harbor Boat Company had sold to Mission Marine and were the same molds that were to be acquired under the Seidelmanns' investment plan. Tsou planned to send these molds to Taiwan for the manufacture of yachts to be imported and sold in the United States. At this time, he began to consider a name for his yachts. He rejected FALCON and EXPRESS after being notified of potential conflicts with other marks by the Patent and Trademark Office. In August 1986, he decided to use the name PACE. Although he was aware of the name PACEMAKER, he testified that he did not think the names PACE and PACEMAKER were confusingly similar and associated PACEMAKER with an abandoned line of yachts. However, he admitted that he was aware that the name PACE had been associated with PACEMAKER. He began advertising his yachts in the fall of 1986 and imported the first PACE yacht in January of 1987 and sold this boat in February of 1987.
 
 
 8
 On October 7, 1986, an attorney for the plaintiffs sent a letter to the defendants, stating that their use of the name PACE infringed the PACEMAKER trademark. This letter was telefaxed to defendants again on October 26, 1986, but Tsou made no response and did not mention the letters to his trademark attorney. In April 1987, the PACE trademark was registered in the U.S. Patent and Trademark Office and accepted on July 16, 1987, after the Office had concluded that the name PACE was not likely to cause confusion with any other trademark. On August 27, 1987, plaintiffs filed a Notice of Opposition with the Trademark Office opposing defendants' PACE registration. Later the Trademark Office determined that the mark was not confusingly similar to any other mark. The defendant Pace Yacht Corporation now manufactures yachts ranging from 33 to 57 feet in length and priced from $98,000 to $560,000. These yachts are advertised extensively in boating magazines and trade journals, and by personal solicitation of yacht dealers.
 
 
 9
 There was testimony from dealers and others familiar with yachts that there was confusion in the market as to yachts manufactured and sold by Pace with those manufactured and sold by plaintiffs. The district court found that Tsou was motivated in selecting the name PACE by a desire "to gain an immediate reputation by borrowing from the good will associated with the name PACEMAKER" and that Tsou had a duty to choose a name which would avoid all possibility of confusion. The district court found Pace guilty of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. Secs. 1114 and 1125(a), and of unfair competition under the common law of Maryland. In its decision, the district court found (a) that the name PACE was likely to cause an appreciable number of people to be confused and think that Pace yachts were associated with Pacemaker yachts; (b) that Pace Yacht Corporation's adoption of the name PACE was a deliberate attempt to benefit from the good will associated with the name PACEMAKER; and (c) that the plaintiffs were entitled to enforce the PACEMAKER trademark.
 
 II
 
 10
 Defendants challenge the district court's findings primarily as they relate to abandonment of the trademark and the finding of confusion. They claim that the high cost of the yachts and the sophistication of yacht purchasers would negate any likelihood of confusion. In particular, they contend that they made out a prima facie case of abandonment that was not rebutted by plaintiffs.
 
 
 11
 Abandonment is described in 15 U.S.C. Sec. 1127 as follows:
 
 
 12
 A mark shall be deemed to be "abandoned"--
 
 
 13
 (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
 
 
 14
 (b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.
 
 
 15
 It is necessary that both elements of abandonment--the actual nonuse of the mark and the intent to abandon it--be strictly proved. Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1043-44 (2d Cir.1980). "Nonuse for two consecutive years is considered prima facie abandonment, ... but this presumption may be rebutted by showing valid reasons for nonuse or by proving lack of intent to abandon." Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir.1985). As early as 1900, the Supreme Court discussed the twin requirement of nonuse and intent to abandon embodied in the statutory definition of abandonment. In Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900), it stated:
 
 
 16
 To establish the defence of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed.
 
 
 17
 The burden of proving abandonment, including the difficult issue of intent to abandon, is upon the Pace Yacht Corporation and Peter Tsou. United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 139 (3d Cir.1981).
 
 
 18
 In the present case, the defendants contend that the trademark was abandoned in 1980 when Mission Marine stopped the manufacture and sale of yachts using the PACEMAKER trademark, and that this discontinuance of use became prima facie abandonment two years later. Prior to trial, the defendants made a motion for summary judgment on their claim that the mark had been abandoned. This motion was denied, and the district court found, after hearing all of the evidence at trial, that plaintiffs had overcome the statutory presumption of abandonment from nonuse. We conclude that these findings are not clearly erroneous.
 
 
 19
 The decision by Mission Marine to discontinue manufacturing PACEMAKER yachts was due to financial problems in another part of its business and was unrelated to yacht manufacturing. Mission Marine continued in its efforts to market the trademark. The mark retained good will as evidenced by its sale and the testimony that when the plaintiffs began manufacturing PACEMAKER yachts, the name gave them market acceptability. The resumption of the use of the mark was within a reasonable time and shorter than the 23 years found not to be an abandonment in Skippy, Inc. v. CPC Int'l., Inc., 674 F.2d 209 (4th Cir.1982), or the seven years in Saratoga Vichy, supra, or the eight years in Sterling Brewers, Inc. v. Schenley Industries, Inc., 441 F.2d 675 (C.C.P.A.1971).
 
 
 20
 However, we note the contrary outcome in Silverman v. CBS, Inc., 870 F.2d 40 (2d Cir.1989), where the court found an abandonment from over 20 years of nonuse and "no plans to resume their use in the reasonably foreseeable future." Id. at 47. However, the court was impressed by the fact that CBS had no intention "to exploit the mark in the reasonably foreseeable future by resuming its use or permitting its use by others." Id. These are important differences from the PACEMAKER facts, in which the owner of the mark attempted to exploit it by selling it and did sell it within a reasonable time for use by another manufacturer of yachts. Consequently, Silverman is not applicable to our facts.
 
 III
 
 21
 Defendants challenge the trial judge's conclusion of the likelihood of confusion, claiming that the court did not give substantial weight to the "product cost--consumer sophistication" factor, because the expensive nature of yachts and the highly sophisticated nature of their consumers negate any likelihood of confusion between the trademarks. Defendants also contend that in deciding likelihood of confusion, the court gave undue weight to defendants' intent in adopting their trademark to trade on the good will and name of PACEMAKER.
 
 
 22
 We find these arguments unpersuasive. First, the opinion of the trial court goes into detail in discussing the high cost of the product and the sophistication of the purchaser. However, these are just a few of the elements that must be considered in determining the likelihood of confusion. Others listed by the court are: the strength or distinctiveness of the mark, the similarity of the two marks, the similarity of the goods or services which the mark identifies, the similarity of the facilities used by the parties in conducting their business, the similarity of advertising used by the parties, the defendants' intent, and actual confusion. Looking at these other elements, there was evidence to support actual confusion and not just the likelihood of confusion. The parties advertised their yachts in the same magazines and showed them at the same boat shows, and there were complaints of confusion.
 
 
 23
 Second, the court did not give undue weight to its finding that Peter Tsou intended to benefit from the good will attributable to the name PACEMAKER; because the intent of the defendant in adopting its mark is a critical factor, this fact alone may be sufficient to justify the finding of confusing similarity. See Chevron Chemical Co. v. Voluntary Purchasing Groups, 659 F.2d 695, 703-704 (5th Cir.), cert. denied, 457 U.S. 1126 (1981). The trial judge found that parts of Tsou's testimony on the issue of intent were not credible, and the issue of credibility is left to the trial judge.
 
 
 24
 The trial court's findings on the likelihood of confusion are reviewed under a clearly erroneous standard. Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526-27 (4th Cir.1984). Our review of the record does not reveal that these findings are clearly erroneous. The trial court gave proper and balanced consideration to all of the evidence presented by the parties on the issue of likelihood of confusion.
 
 
 25
 Prior to oral argument the plaintiffs made a motion to voluntarily dismiss their cross appeal, and this motion is granted.
 
 
 26
 We conclude that the findings of the trial judge are not clearly erroneous and there is no error in his legal conclusions, so the judgment of the district court is affirmed.
 
 
 27
 AFFIRMED.
 
 
 28
 MURNAGHAN and SPROUSE, Circuit Judges, joined in this opinion.