### RALSTON PURINA COMPANY, Appellant/Cross-Appellee,

v.

### ON–COR FROZEN FOODS, INC., Appellee/Cross-Appellant.

**Appeal Nos. 84–682, 84–728.
Opposition No. 64966.**

United States Court of Appeals,
Federal Circuit.

Oct. 15, 1984.

---

Alfred T. Lee, New York City, argued for appellant/cross-appellee. With him on the brief were Griffith B. Price, Jr., New York City, and Alpheus E. Forsman, St. Louis, Mo.

Myron C. Cass, Chicago, Ill., argued for appellee/cross-appellant. With him on the brief was Herbert J. Singer, Chicago, Ill.

Before MARKEY, Chief Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.

JACK R. MILLER, Circuit Judge.

These are consolidated appeals from the Patent and Trademark Office Trademark Trial and Appeal Board ("board"), opinion reported at 220 USPQ 567 (TTAB 1983). In Docket No. 84–682 Ralston Purina Company ("Ralston") contests the board's decision sustaining the opposition of On-Cor Frozen Foods, Inc. ("On-Cor"), to Ralston's application to register the mark ENCORE for cat food. The board premised its decision on its conclusion that Ralston's first use of Encore was in connection with "a product other than that which was intended to be identified by the mark used thereon," and that Ralston's application was, accordingly, void *ab initio*.

In Docket No. 84–728, On-Cor contests the board's holding that Ralston's mark ENCORE does *not* so resemble On-Cor's registered mark ON–COR for frozen food products for humans as to be likely, when applied to Ralston's cat food, to cause confusion.

We affirm the board's decision on the likelihood of confusion issue and reverse its decision sustaining the opposition on the basis that Ralston's application was void *ab initio.*

### Background

Ralston's application was filed June 24, 1980, reciting a date of first use of April 5, 1980.[1] On-Cor filed its opposition on August 10, 1981, as the owner of incontestable registrations for ON–COR and ON–COR with a design.

Ralston has been involved in the development of a new cat food concept since late 1979 or early 1980, defined as a cat food which had a gravy coating and could be served dry or, if water were added, would be a moist gravy-covered cat food. The development project has been known as the ALL WAYS concept. There has been no actual advertising of ENCORE cat food. However, in September of 1981 Ralston made an expenditure of approximately $10,000 to prepare story boards in the development of brand names for the ALL WAYS product, some of which boards were for ENCORE and others were for the mark EASY PLEASINS. On-Cor has shown long usage, extensive advertising, and substantial sales of its products under the ON–COR mark and has built a successful business around that mark.

### Likelihood of Confusion Issue

 In holding for Ralston on this issue, the board, as On-Cor points out, recognized that there are at least two cases holding that marks for human food and pet food are likely to lead to confusion, viz. *V.I.P. Foods, Inc. v. Vulcan Pet, Inc.,* 210 USPQ 662 (D.Okla.1980), and *American Sugar Refining Co. v. Andreassen,* 296

F.2d 783, 132 USPQ 10 (CCPA 1961). However, it cautioned that "there is no per se rule regarding food items but that each case must be decided on its own facts." It noted that in *American Sugar* the marks were identical and opposer had been selling its human food product under the mark DOMINO since 1891 and had a valid registration since 1901; that in *Vulcan Pet* both parties were using the same mark VIP or V.I.P., with similar logos, and there was evidence of actual confusion. The board made clear that there is no dispute that there is a phonetic identity between applicant's and opposer's marks, but that the rule that any one of three factors (similarity in sound, meaning, or appearance) *may* be sufficient to indicate likelihood of confusion does not *necessarily* do so, citing *Sure-Fit Products Co. v. Saltzson Drapery Co.,* 254 F.2d 158, 117 USPQ 295 (CCPA 1958). "We take that to mean," the board said, "that if the other two factors are so different as to outweigh the single similarity, an opposite result could be reached." It agreed with Ralston that the respective marks do not look alike and rejected On-Cor's argument that, because of phonetic identity, the marks would necessarily have the same meaning to purchasers. It reasoned that the mark ENCORE could be considered to have the connotation of "an additional performance," whereas the mark ON–COR "does not necessarily suggest the same image." Finally, the board effectively concluded that it is unlikely that, given the differences in the marks and the goods, purchasers familiar with ON–COR would mistakenly believe that ENCORE cat food was an addition to or somehow associated with On-Cor's frozen food items.[2] We agree.

---

**1.** Discovery revealed that the first (and only) use was on June 5, 1980, when an interstate shipment was made of one of Ralston's regular line, dry cat foods under the mark ENCORE. The shipment consisted of twelve 28-ounce boxes and the price was $4.13.

**2.** The board observed that it was aware of testimony that there are companies which manufacture and sell both human and pet foods and that

Ralston is one such company, but pointed out that there is no evidence that both types of goods are ever marketed by these companies under the same product marks. Although the board did not comment on On-Cor's argument regarding the same channels of trade, its finding that On-Cor's principal channel of trade is through supermarkets to the retail customer indicates that the point was considered.

*Validity of Application Issue*

The basis for the board's conclusion that Ralston's application was void *ab initio* is the board's misapprehension of the law, viz. that "bona fide initial use" requires that the goods so used be *identical* to the goods the mark is intended ultimately to identify.[3] Here, the board said, "the product shipped was not the ALL WAYS cat food under development but was one of the dry cat foods already in applicant's [Ralston's] line." It pointed out that the ALL WAYS cat food was not yet marketable and that Ralston's product manager testified that, as of July 21, 1982, there were still three major things to complete before test marketing could begin: product, packaging, and brand name; also that test marketing was not expected to occur until some time after July 1983. "This appears to be a classic case," the board said, "of [wrongfully] attempting to reserve a mark until there is a product on which it may be used. We do not believe that the liberality of the token use doctrine extends this far," citing *Gay Toys, Inc. v. McDonald's Corp.,* 585 F.2d 1067, 199 USPQ 722 (CCPA 1978); *CPC International, Inc. v. The Seven-Up Co.,* 218 USPQ 379 (TTAB 1983); *PRF Corp. v. Acme Quilting Co.,* 218 USPQ 276 (TTAP 1982); *Richardson-Vicks, Inc. v. Franklin Mint Corp.,* 216 USPQ 989 (TTAB 1982); and *Times Mirror Magazines, Inc. v. Sutcliffe,* 205 USPQ 656 (TTAB 1979). All of these cases are distinguishable from the case before us. In *Gay Toys,* the applicant claimed use of BIG MAC for toy trucks, but there were no such toy trucks in existence—only a plaster mock-up; in *CPC International,* the board found that the applicant had no definite plans either at the time of the token shipment of goods or at the time of trial to continue use of the involved mark in connection with a specific product; in *PRF Corp.,* the applicant's mark was not used on the goods in question until after the filing date on October 4, 1976, as shown by invoices indicating that first shipments commenced around the end of October of 1976; in *Richardson-Vicks,* the board found that, at the time of shipment, there was no specific product or products contemplated to be sold under the applicant's mark;[4] and in *Times Mirror,* the goods were described as "monthly magazine," but there was no record evidence that a magazine was currently published.[5]

Moreover, the proper question is not, as the board said, whether the "liberality" of the token use doctrine extends so far as to cover this case, but, rather, whether the "identical goods" test applied by the board

---

**3.** The board said it is clear that it is possible to create trademark rights by a bona fide initial use of a mark in commerce on a product followed by activities which would indicate a continuing effort to place *the product* on the market on a commercial scale, citing *La Maur Inc. v. International Pharmaceutical Corp.,* 199 USPQ 612 (TTAB 1978). However, in that case the involved "product" was toothpaste, and it was assumed by the board that this included all types of toothpaste, including nontherapeutic, toiletry-type toothpaste.

**4.** The board in that case said that—

it has been recognized in recent years that in view of the expense of introducing a new product on the market on any scale and the risk attached thereto prior to the screening process involved in seeking federal registration, a token sale or a single shipment in commerce, with the color of a bona fide transaction, may be sufficient for the purpose provided it is followed by other shipments or accompanied by activities or circumstances which would indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale. See: *La Maur Inc. v. International Pharmaceutical Corporation* [note 4, *supra* ]. *Richardson-Vicks, Inc.,* 216 USPQ at 991.

**5.** The *Times Mirror* board pointed out that—

the fact that a sale or shipment of goods bearing a trademark was designed primarily to lay a foundation for registration does not, per se, invalidate any such application or a registration based thereon. Moreover, it does not make any difference that there may have been a lapse of time between this first shipment and any subsequent ones providing that there is evidence, during this period, of activities or circumstances which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a reasonable time, as established by practices in the particular trade.

*Time Mirror Magazines, Inc.,* 205 USPQ at 662.

to this case is invalid considering the realities of the marketplace. Amicus United States Trademark Association, taking no position on the question of whether registration should issue for Ralston's ENCORE mark for cat food, argues that "tremendous expenditures and financial risks are involved in developing and introducing a new product on a national scale" and that it is "common practice, dictated by the commercial realities, for a product as well as its brand name, to be extensively test marketed, and there are frequently modifications of the original product concept." Amicus quotes from Leitten, *Establishing and Protecting Trademarks: A Look at Token Use*, U.S.T.A. Executive Newsletter No. 41, 1983, regarding the recommended manner of first use:

> If the product which will be offered commercially is available, then that product should be involved in the initial sale. It can be expected, however, that in most instances the specific new commercial product will still be in the development stage at the time the trademark for the new product is selected. After all, the entire token use doctrine was developed to deal with the gap which arises between mark selection and final product commercialization. Therefore, when the final product form has not yet been developed or if development is ongoing, care should be taken to use a currently available version of the new product (i.e., the current prototype) or to select the closest available product in the company's present line.

The arguments of Amicus are not unlike statements by the board in other cases, such as those quoted in notes 5 and 6, *supra*. Even more on point is the board's statement in *E.I. du Pont de Nemours & Co. v. G.C. Murphy Co.*, 199 USPQ 807, 813 (TTAB 1978):

Insofar as the change of product is concerned, the record is clear that the formula and positioning of the current "EASY CARE" paint is different from that employed in the test market, namely, a budget type paint vis-a-vis a premium-priced paint. But, *both products are paint products with substantially similar chemical ingredients, although possibly differently formulated* [the only difference is essentially the omission of "TEFLON E" from the current product]; both product lines offered a consumer a washable, waterbase, flat finish paint which would be applied in the same ways; and both products were distributed through some of the same trade channels, namely, discounters, mass-merchandisers, and the like. In essence, opposer marketed paint under the "EASY CARE" mark in the test market, and it continues to market "EASY CARE" paint. *The inherent and identifiable character of the goods remain the same.* There have been a number of decisions holding that a change in the nomenclature of a product, the formulation or the primary purpose of a product, or even a change in a type of product does not constitute an abandonment of the mark used therewith. [Citations omitted; emphasis supplied.]

*See also La Maur Inc. v. International Pharmaceutical Corp.*, note 4, *supra*.

We are persuaded that the change in formulation of Ralston's cat food resulting from the ALL WAYS project has not changed the "inherent and identifiable character" of the product used in Ralston's token shipment, as described in its application.

Accordingly, we hold that Ralston's application was not void *ab initio*.[6]

---

**6.** On-Cor also contests the board's failure to consider the issue of abandonment, which it asserts took place by reason of more than two consecutive years of nonuse by Ralston. However, we are satisfied that Ralston has rebutted any prima facie showing of abandonment arising from nonuse of its mark for two consecutive years by evidence of its intent to resume such

use. As related earlier, Ralston has had an ongoing development project (ALL WAYS) under which it prepared story boards in the development of brand names for the ALL WAYS product, some of which boards were for EN-CORE. Moreover, it was only prudent for Ralston to refrain from use of its mark following

AFFIRMED IN PART; REVERSED IN PART.

ON–COR's filing of its opposition on August 10, 1981.