**SOCIETE DE DEVELOPMENTS ET D'INNOVATIONS DES MARCHES AGRICOLES ET ALIMENTAIRES–SO-DIMA–UNION DE COOPERATIVES AGRICOLES and General Mills Products Corp. and Yoplait USA, Inc., Plaintiffs,**

v.

**INTERNATIONAL YOGURT CO., INC., and Global Gourmet, Inc., Defendants.**

Civ. No. 86–706–PA.

United States District Court,
D. Oregon.

June 15, 1987.

J. Pierre Kolisch, Peter E. Heuser, Robert D. Varitz, Kolisch, Hartwell & Dickinson, Portland, Or., Leslie Bertagnolli, Martin R. Greenstein, Baker & McKenzie, Chicago, Ill., for plaintiffs.

Daniel P. Chernoff, J. Peter Staples, Chernoff, Vilhauer, McClung & Stenzel, Portland, Or., for defendants.

## OPINION

PANNER, Chief Judge.

Plaintiffs SODIMA, General Mills Products Corp. (General Mills), and Yoplait USA, Inc. bring this action for infringement of their federally registered trademarks YOPLAIT and YOCREME. Defendants International Yogurt, Inc. and Global Gourmet, Inc. have been using the name YOCREAM and 800–YO CREAM. They deny any likelihood of confusion between YOPLAIT and YOCREAM, challenge plaintiffs' YOCREME mark as void, and counterclaim for infringement of their common law trademarks YOCREAM and 800–YO CREAM. The parties agree that YOCREME and YOCREAM are confusingly similar. The central issue in this case is whether plaintiffs abandoned or warehoused their YOCREME mark. The case was tried to the court beginning February 24, 1987. I find no likelihood of confusion between YOPLAIT and YOCREAM. I cancel plaintiffs' federal YOCREME trademark, and I assign common law trademark rights to the parties according to priority of use.

## FACTS

Plaintiff SODIMA is a French agricultural cooperative company. It owns the U.S. trademark registrations on YOPLAIT Nos. 930, 605, 1,134,239, and 1,224,432, and the registration on YOCREME No. 1,186,-981. SODIMA first began to sell its YOPLAIT yogurt in the United States in 1974. In October 1977, SODIMA granted an exclusive license to General Mills to produce and market YOPLAIT. YOPLAIT was manufactured and distributed through General Mills' wholly-owned subsidiary, Yoplait USA, Inc. It has since been marketed continuously. YOPLAIT sales in 1978 were about $16 million. They are now nearly $200 million annually.

In 1978 Yoplait USA formulated a five-year plan which targeted refrigerated yogurts, frozen yogurts, refrigerated desserts, and soft cheeses as potential additional product lines, following the trend toward yogurt consumption in the American market. Top priority was assigned to a refrigerated dessert line of custard-style yogurt. The name YOCREME was coined at a January 1979, name-generating session. By August 1979 plaintiffs rejected the name for the new custard-style yogurt. Nevertheless, they liked the French-sounding name with its implications of creaminess, and decided to register it as a trademark.

For the sole purpose of registering the trademark YOCREME, Yoplait USA sold four products in interstate commerce: a mousse, a plain custard-style refrigerated yogurt, a frozen yogurt, and a refrigerated soft cheese. This October 1979 sale to a friend in Wisconsin totalled $2.52. SODIMA filed the trademark application with the United States Patent and Trademark Office in January 1980. The trademark office granted the registration in January 1982.

In 1979 and again in 1980, plaintiffs negotiated with two parties other than defendants who were using or considering using the name "Yo Cream." One was a small Maryland retailer who agreed to abandon use of the name. The other was a major competitor, Land O' Lakes, who agreed to abandon use of the name in exchange for uncontroverted use of the name YOCHEESE.

From 1979 until early 1982, plaintiffs did not develop any products associated with the name YOCREME or market anything as YOCREME. In March 1982, a report prepared for Yoplait USA suggested that the name might be good for use with proposed soft cheese products. Plaintiffs followed up on that suggestion in May 1982, by using YOCREME as one of fourteen different potential names in a taste test for

prototype non-yogurt cheese products. YOCREME scored among the five top names for the cheese product. In a July 1982 name evaluation test for the cheese product, YOCREME ranked fourth among a list of 232 names. However, plaintiffs never again considered the name for that product and they never marketed the cheese product.

Simultaneously, plaintiffs were experimenting with a non-yogurt pudding product. YOCREME topped the list of preferred names for the pudding in a July 1982 test. It was the first and last time the mark was considered in that connection.

In response to competition in the burgeoning yogurt business, plaintiffs experimented with a premium fruit-on-the-bottom yogurt line. The proposed product was significantly higher in butterfat content than the competitor's product. In April and May 1983, plaintiffs tested the YO-CREME name, along with sample advertisements, on this product. Market tests failed to indicate sufficient sales for the premium product. Consequently, in the summer or fall of 1983, plaintiffs reduced the richness of the product and discontinued the YOCREME mark for that product.

Finally, in early 1984, plaintiffs developed a formula for high fat yogurt, a concept new to the American market that was based upon German and Swiss yogurts. In May 1984, the name YOCREME was assigned to the new product. In December 1984, it was made a top priority project. Between late 1984 and August 1986, twelve tests costing about $368,800 thoroughly examined YOCREME for taste, flavors, packaging, likely volume of sales, advertising, and pricing. The name YOCREME—and only the name YOCREME—was used in each test. Plaintiffs capitalized the project at $3 million, and invested an additional $6 million on consumer coupons, trade promotion, and print and television advertising. YOCREME began to be sold in grocery stores in July 1986 and achieved full national distribution by September 1986. By February 1987, YOCREME had achieved about $10 million in sales nationwide.

In May 1985, plaintiffs learned that defendants were marketing frozen yogurt under the name 800–YO CREAM.

Defendants entered the frozen yogurt business in 1976. They were experienced in business and in the use of trademarks. Their product was a liquid mix designed for stores, institutions or other outlets with soft ice cream machines. It could also be refrigerated and sold as a hard pack. Between 1977 and 1982, defendants operated stores in Washington and Oregon and franchised others under the name "The Yogurt Stand" and "The Healthi Deli." In 1982 they experimented with an upgraded preflavored product containing a higher butterfat content. They called it YOCREAM. In late 1982 it was sold in Oregon and Washington; in 1983 it was also sold in Alaska, Hawaii and California.

In October 1983, defendants conducted a trademark search which showed the existence of plaintiffs' YOCREME registration. Defendants telephoned plaintiffs to inquire about their intentions for the mark. Defendants verified that YOCREME was not being marketed at that time.

At first YOCREAM was identified simply by signs on the dispensing machines or elsewhere in the stores. By spring of 1984 the name was printed on the cartons shipped to the buyers. Since 1984 defendants vigorously promoted YOCREAM at trade and restaurant shows and by direct solicitation to distributors throughout most of the country. A telephone number, 800 YO–CREAM, was acquired in mid–1984 to take orders and inquiries.

Defendants never attempted to register YOCREAM but did, in March 1985, file an application with the U.S. Patent and Trademark Office to register 800–YO CREAM, claiming June 1984 as the date of first use. The application was rejected in May 1985 on the basis of conflict with YOCREME. In June 1985, John Hanna of the defendants telephoned Richard Berman, plaintiff's in-house counsel, regarding use of the mark. In October 1985, Mr. Hanna filed a declaration with the Trademark Office stat-

ing that plaintiffs told him that they were not and never had marketed any products under the YOCREME mark.

## STANDARDS

■ The Lanham Act accords the presumption that a registered trademark is valid and that the holder is entitled to exclusive use of the mark. 15 U.S.C. §§ 1057(b), 1115(a) (1982). The certificate constitutes prima facie evidence of ownership of the mark, absence of likelihood of confusion with other registered marks, and continued use of the mark from the date of filing the application. *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 1402, 181 U.S.P.Q. 272 (C.C.P.A.1974). The burden of proof rests upon the challenger to rebut this presumption by a preponderance of the evidence. *Vuiiton et Fils, S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 210 U.S.P.Q. 351 (9th Cir.1981), *citing Massey Junior College.*[1] It is true that

> [c]ancellation of a valuable registration around which a large and valuable business goodwill have been built should be granted only with "due caution and only after a most careful study of all the facts." Petitioner to sustain its burden of proof, must leave nothing to conjecture.

*Rockwood Chocolate Co. v. Hoffman Candy Co.*, 372 F.2d 552, 555, 54 CCPA 1061, 152 U.S.P.Q. 599 (1967) (citations omitted). Caution and care are required in every case, but this does not alter the required standard of evidence, which is that of a preponderance. *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1014 n. 8, 202 U.S.P.Q. 100 (C.C.P.A.1979).

Defendants must prove their case by a preponderance of the evidence to prevail in their contentions that YOCREAM is not confusingly similar to YOPLAIT, that YO-CREME is invalid *ab initio* because its registration was based on a "sham" transaction, or that YOCREME is invalid in equity because plaintiffs "warehoused" the mark.

I must also determine the proper standard to be applied to defendants' assertion that plaintiffs abandoned the YOCREME mark. The Lanham Act permits cancellation of a trademark "at any time if the registered mark ... has been abandoned...." 15 U.S.C. § 1064 (1982). A mark is deemed abandoned:

> when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

15 U.S.C. § 1127 (1982). Thus the statute contains two elements for abandonment—non-use and intent not to resume use—and it permits evidence of intent not to use to be inferred from actual non-use which has lasted for two years. The statute does not, however, explain what is meant by "prima facie abandonment." In particular, it fails to specify whether a showing of two years of non-use merely shifts the burden of coming forward with evidence (burden of production) to the trademark registrant or whether it also shifts the burden of proof (risk of nonpersuasion) to the registrant.

The legislative history of the Lanham Act suggests that the "intent not to resume use" standard was adopted from the common law.[2] At the turn of the century

---

**1.** Some cases imply that the applicable quantum of evidence required to rebut this presumption is that of clear and convincing evidence. *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254, 216 U.S.P.Q. 579 (9th Cir.1982); *Aluminum Fabricating Co. v. Season-All Window Corp.*, 259 F.2d 314, 316, 119 U.S.P.Q. 61 (2d Cir.1958). Similarly, some older cases held that petitioners who sought to cancel a previously registered mark had a "much heavier burden of proof" than those who opposed registration of the mark. *W.D. Bryon & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 54 CCPA 1442, 153 U.S.P.Q. 749 (1967). The Court of Customs and

Patent Appeals in *Massey* explicitly considered the quantum of evidence required to rebut a registration, and held that the statutory presumption does not enhance the evidentiary burden beyond a preponderance of the evidence. *See also Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1014 n. 8, 202 U.S.P.Q. 100 (C.C.P.A.1979). *Accord, Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 n. 6, 207 U.S.P.Q. 465 (1st Cir.1980)

**2.** *See Trademarks: Hearing Of H.R. 82 Before the Subcom. of the Committee on Patents*, 78th Cong., 2d Sess. 24 (1944), in which Daphne

the Supreme Court stated "Acts, which unexplained, would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed." *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31, 21 S.Ct. 7, 12, 45 L.Ed. 60 (1900). Ten years later the Court expressed similar reluctance to find abandonment:

> But the loss of the right of property in trade-marks upon the ground of abandonment is not to be viewed as a penalty either for non-user or for the creation and use of new devices. There must be found an *intent* to abandon, or the property is not lost. . . .

*Baglin v. Cusenier Co.*, 221 U.S. 580, 598, 31 S.Ct. 669, 674, 55 L.Ed. 863 (1910) (emphasis in original). In different words, but to the same effect, modern cases have held that abandonment, being in the nature of a forfeiture, must be strictly proved. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043–44, 208 U.S.P.Q. 175 (2d Cir.1980); *Wallpaper Mfgrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 761, 214 U.S.P.Q. 327 (C.C.P.A.1982) (*both cases citing* 1 J. McCarthy, Trademarks and Unfair Competition, § 17.3 at 592–93 (1973)). As a consequence of this judicial disfavor of abandonments, some cases appear to impose only a burden of production on the registrant to overcome the presumption of abandonment. In *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 680, 169 U.S.P.Q. 590 (C.C.P.A. 1971), the Court of Customs and Patent Appeals held that the facts "negate the presumption of abandonment that arises from the non-use for more than two consecutive years." Again in *Miller Brewing Co. v. Oland's Breweries (1971), Ltd.*, 548 F.2d 349, 352, 192 U.S.P.Q. 266 (C.C.P.A.1976), it held that the evidence in that case "rebuts the prima facie case of abandonment."

The Fifth Circuit, holding that an oil company's trademark maintenance program did not constitute sufficient "use" to avoid prima facie abandonment, cited *Sterling Brewers* for the following proposition:

> The *burden of proof* is on the party claiming abandonment, but when a prima facie case of trademark abandonment exists because of non-use of the mark for over two consecutive years, the owner of the mark has the *burden to demonstrate* that circumstances do not justify the inference of intent not to resume use.

*Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99, 217 U.S.P.Q. 1200 (5th Cir.1983) (emphasis added). The Eleventh Circuit, in turn, cited *Exxon* as sole authority for shifting the *burden of proof* to the

---

Robert, Member of Trademark Legislation Committee, American Bar Association, stated:

> There is in this bill a definition of abandonment. . . . That, of course, is present law. Intent not to resume may be inferred from circumstances. The bill provides that discontinuance of use for 2 consecutive years shall be prima facie abandonment. It would shift the burden to the registrant.

Later in the same hearing, the following colloquy occurred among Senator Hawkes, Karl Fenning, a patent attorney, and Henry J. Savage, a representative of the National Association of Manufacturers:

> Mr. Fenning: Under the present law the user of a mark may drop it, but it still remains on the register for 20 years. Nobody knows whether it is in use or not. Under the new bill at the end of 5 years a registrant again comes in with an affidavit that he is using the mark, or it will be canceled. That will remedy that, but—
> Sen. Hawkes: Even if he does or does not come in with a certificate of use, still if he abandons the trademark for a period of 2 years the trademark is automatically canceled.
> Mr. Fenning: It is not. After the affidavit of use has been filed 2 years of discontinuance of use is evidence of abandonment.
> Sen. Hawkes: It is pretty good evidence of abandonment under this law.
> Mr. Fenning: Yes, sir.
> Sen. Hawkes: If anyone else wanted to use that trademark, and could show that the use of the trademark had been abandoned for 3 or 4 years I do not think there is any doubt a court would uphold the use of the trademark in the hands of somebody else.
> Mr. Fenning: Yes; unless due to circumstances beyond the control of the registrant.
> Sen. Hawkes: Do you mean he would have to be out of business?
> Mr. Savage: Yes, sir.
> Mr. Fenning: Or an act of war.
> Mr. Savage: Yes, sir.
> Mr. Fenning: Prohibition would be an example.
> Sen. Hawkes: It might not be a very good example. [Laughter.]

trademark registrant. The Eleventh Circuit said:

> Remy Martin made out at least a prima facie case of abandonment. The burden of proof then shifted to Myers to demonstrate that circumstances did not justify the inference of intent not to resume use. The court below erred as a matter of law in not articulating and applying this rule.

*E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.*, 756 F.2d 1525, 1532, 225 U.S.P.Q. 1131 (11th Cir.1985). The Eleventh Circuit again shifted the burden of proof to the trademark registrant in *AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 994, 1 U.S.P.Q.2d 1161 (11th Cir.1986).

The Second and Ninth Circuits, however, have not shifted the burden of proof. In *Saratoga Vichy*, 625 F.2d at 1037, the Second Circuit affirmed a grant of summary judgment in favor of the state where the plaintiff had alleged that the state's trademark was abandoned. The court held that whether the matter was appropriate for summary judgment depended on whether prima facie abandonment from non-use "creates a rebuttable presumption that disappears in the face of contrary evidence or permits the trier to infer intent to abandon, despite contrary evidence." *Id.* at 1044. The court decided that in the context of summary judgment, prima facie abandonment means no more than a rebuttable presumption of abandonment. *Id.* The Ninth Circuit, holding that the trademark of a fish canner was not abandoned, cited *Saratoga Vichy* for the proposition that "nonuse for two consecutive years constitutes prima facie abandonment, but this is a presumption that may be rebutted by showing valid reasons for nonuse or by proving lack of intent to abandon." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396, 227 U.S.P.Q. 674 (9th Cir. 1985).

■ Although Congress clearly intended some consequence of a prima facie abandonment, none of the cases clearly decide whether the consequence is to shift the burden of production, or to shift the burden of proof to the party that has allegedly abandoned use of its mark. The better rule is that the burden of production shifts to the trademark registrant to produce evidence of lack of intent not to use the mark following two years of non-use. When the registrant has come forward with evidence, the burden of proof remains with the challenger. The owner of a federally registered mark should enjoy an overarching presumption under sections 1057(b) and 1115(a) of the Lanham Act that the registration is valid. *Massey*, 492 F.2d at 1402. In addition, trademarks are valuable rights; and abandonment should be worked with reluctance.

In this case the plaintiffs have come forward with evidence of intent to use the mark. The defendants are required to prove by a preponderance of evidence that plaintiffs intended not to use YOCREME.

Finally, if this court finds that plaintiffs' federal YOCREME trademark is invalid, it must decide the parties' respective trademark rights under the common law in each state. *New West Corp. v. NYM Company of California, Inc.*, 595 F.2d 1194, 202 U.S.P.Q. 643 (9th Cir.1979). Common law accords rights to the first bona fide user by a preponderance of the evidence. *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1472, 1 U.S.P.Q.2d 1772 (Fed.Cir.1987).

## DISCUSSION

### A. Infringement Of YOCREAM On The YOPLAIT Trademark.

■ The threshold question in analyzing plaintiffs' contention that defendants infringed on their YOPLAIT trademark is whether there is a likelihood of confusion between the marks YOPLAIT and YO-CREAM. I must determine whether consumers of YOCREAM are likely to assume that the product is made by the makers of YOPLAIT. *Shakey's Inc. v. Covalt*, 704 F.2d 426, 218 U.S.P.Q. 16 (9th Cir.1983). The Ninth Circuit has developed factors to analyze likelihood of confusion. They are: (1) strength of the mark; (2) similarity of the marks; (3) marketing channels and proximity of the goods or services; (4) good faith and intent; and (5) evidence of

actual confusion. *Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 1 U.S.P.Q.2d 1809 (9th Cir.1987).

### 1. *Strength of the Mark.*

In general, distinctive marks are considered "strong" and deserving of greater protection. In *Surgicenters of America, Inc. v. Medical Dental Surgeries Co.,* 601 F.2d 1011, 1014–15, 202 U.S.P.Q. 401 (9th Cir.1979), the court outlined a continuum of marks ranging from the generic term, which is not protected under any circumstances, to the "arbitrary or fanciful" marks coined solely for use as trademarks, which are the strongest possible marks. Most marks fall between those two extremes. A "descriptive" term specifically describes a characteristic or ingredient. A "suggestive" term is stronger because it leaves something to the imagination. The holder of a unique or distinctive word must show "secondary meaning," that is, an association between the product and the mark in consumers' minds. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354, 228 U.S.P.Q. 346 (9th Cir.1985). Advertising may increase the strength of a mark by increasing consumer recognition of it, but advertising does not of itself automatically make a suggestive mark strong. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 350, 204 U.S.P.Q. 808 (9th Cir. 1979).

To the American eye unaccustomed to French phrases, YOPLAIT has a distinctiveness that is the earmark of a strong name. Yoplait, USA has spent over $50 million advertising the YOPLAIT name. However, the "YO" phrase became a relatively common prefix or suffix to suggest a yogurt product. I find YOPLAIT to be strong and suggestive, but not unique.

### 2. *Similarity of the Mark.*

I must also test the marks for similarity in appearance, sound and meaning. *Nu-tri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d at 605. The marks are considered in their entirety. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444, 205 U.S.P.Q. 981 (9th Cir.1980). The identical "YO" prefix is the predominant similarity of the marks. In *Spring Mills, Inc. v. Borlan Industries, Inc.,* 215 U.S.P.Q. 613 (T.T.A.B.1982), the Trademark Trial and Appeal Board found ULTRAVELVET likely to be confused with ULTRASUEDE, primarily because the prefix "ULTRA" was the distinctive portion of each party's mark. Both marks signified similar kinds of fabric. In *Spring Mills,* however, there was no extensive third-party use of the prefix ULTRA, and third-party use of the prefix was far outweighed by the fame of the mark. *Id.* at 616. *Nutri/System* also involved identical prefixes for weight loss programs, NUTRI/SYSTEM and NUTRI–TRIM. That court found the marks were not similar despite the identical prefixes.

Likelihood of confusion between similar marks is increased when, as here, the average consumer does not ponder at length the choice of products from a grocery shelf. *Burger Chef Systems, Inc. v. Burger Man, Inc.,* 181 U.S.P.Q. 168 (C.C.P.A. 1974). Nevertheless, "YO" is commonly used by third-parties as a prefix or suffix for yogurt products.[3] Plaintiffs have acknowledged this. When they agreed in 1980 not to oppose Land O' Lakes's use of YOCHEESE if Land O' Lakes did not use YOCREAM, Bruce Becker, business director of Yoplait USA, stated that "since there are many other products in the United States which begin with YO, I have no problem with granting [Land O' Lakes's] request." I find that YO does not, of itself, make the marks strongly similar or confusing.

Beyond the YO prefix, the two marks do not look or sound alike, although both are two-syllable words with the accent on the

---

**3.** Plaintiffs alone have registered YOPFLAN, YOPI, YOZEN, YOPLIGHT, and YOPLAIT FLEUR BLEUE. Other federally registered trademarks include YOGO, YONSON, YOGO-NAISE, YONUT, YO–SICLE, YOFERS, YOGUR–YEAST, YOZERT, YOGO–PREME, YOGWICH, YOFU, YOGUMENTS, YOGI, YOGLACE, YOJ-OUR, YUM–YO, SNOW–YO, DARI–YO, DANNY–YO, LO–YO, and FRO–YO. This does not include state registered or common law trademarks.

last syllable. YOPLAIT is pronounced yo-PLAᵛ. The vowel sound of the dominant last syllable in YOCREAM is very different. Nor are the words similar in meaning. Plaintiffs argue that their advertising, which emphasizes the creaminess of their product, has created a similarity in meaning to YOCREAM. However, it is not the secondary meaning that is the object of analysis, but rather the verbal translation of the word. *Plough, Inc. v. Kreis Laboratories*, 314 F.2d 635, 638, 136 U.S.P.Q. 560 (9th Cir.1963). As to the verbal translation, plaintiffs point out that "lait" in French means "milk," the fundamental dairy product from which yogurt and cream derive. On the other hand the French word "plait" means "please." YOPLAIT is pronounced yo-plait, not yop-lait. In any case, I doubt that many American consumers will appreciate the plait on words.

### 3. *Marketing Channels and Proximity of the Goods.*

YOPLAIT and YOCREAM are in the same marketing channels and are sold adjacent to each other.

### 4. *Good Faith and Intent.*

If the infringer knowingly adopted a mark similar to another's, then the court must examine the infringer's intent. *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d at 606. Defendants were aware of the existence of YOPLAIT before they marketed YOCREAM. David Hanna, president of the defendants, testified that in October 1983, he was advised by an attorney to obtain a trademark search report on YOCREME. He was not advised to obtain one on YOPLAIT, nor was he concerned about the possibility of conflict with that name.

### 5. *Evidence of Actual Confusion.*

Evidence at trial included a letter sent to Yoplait, USA from a consumer complaining that YOCREAM is too similar a name. Her enclosures indicate, however, that she was complaining of the similarity of YOCREAM to YOCREME, not of YOCREAM

to YOPLAIT. Plaintiffs also presented evidence that some participants in some of the various tests felt that YOCREME implied a relationship to YOPLAIT. Often, however, the participants were already aware of the connection of YOPLAIT to YOCREME. There was little or no evidence of actual confusion.

YOPLAIT is a strong mark, but YOPLAIT and YOCREAM are dissimilar. YOCREAM does not infringe on YOPLAIT because there is no evidence of confusion and no evidence of bad faith by defendants.

### B. *Validity Of The Trademark Based Upon The Token Sale.*

■ As mentioned previously, in October 1979, plaintiffs consummated a $2.52 token shipment and sale for the sole purpose of establishing use in commerce for federal trademark purposes. An axiom of trademark law is: no trade, no trademark. The right to register a mark depends upon actual use in trade. *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 97 U.S.P.Q. 252 (9th Cir.1953). The Lanham Act provides:

> For the purposes of this Act a mark shall be deemed to be *used in commerce* (a) on goods when it is placed in any manner on the goods or their containers ... and the goods are sold or transported in interstate commerce.

15 U.S.C. § 1127 (1982) (emphasis added).

■ However, the doctrine of token use honors such sales when the product is undergoing development. A single instance of use, if accompanied by circumstances showing an intention to continue use, is sufficient to establish right to its use. *Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp.*, 237 F. 125 (S.D.N.Y.1916). The use must be bona fide, *Avakoff v. Southern Pacific Co.*, 765 F.2d 1097, 1098, 226 U.S.P.Q. 435 (Fed.Cir.1985), or at least have the "color" of a bona fide transaction. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 U.S.P.Q. 758, 764 (T.T.A.B.1974). A token sale may be considered a sham if the goods are immediately returned, *Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 437, 182 U.S.P.Q. 65 (2d Cir.1974), or if the shipment

to regional managers is an essentially internal non-public transaction. *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265, 185 U.S.P.Q. 1 (5th Cir.1975). The fact that the sale is designed primarily to lay a foundation for registration of the mark does not, per se, invalidate it. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 U.S.P.Q. at 764. This is especially true when considerable cost and risk of development is required to introduce a new product on the market. *Id.* Although the Trademark Trial and Appeal Board has adopted "a most liberal policy" in this regard, it noted:

> There are, however, certain restrictions or limitations on this practice, ... most important of all, that these shipments be accompanied or followed by activity or circumstances which would tend to establish a continuing effort or intent to continue such use and place the product so shipped on the market on a commercial scale.

*Id.* at 765. A hiatus of eighteen months in sales, absent any indication of intent to proceed, is reasonable if followed by such activity. *Fort Howard Paper Co. v. Kimberly-Clark Corp.*, 390 F.2d 1015, 1017, 157 U.S.P.Q. 55 (C.C.P.A.), *cert. denied*, 393 U.S. 831, 89 S.Ct. 99, 21 L.Ed.2d 101 (1968). Introducing a new product on the national market can be an expensive, lengthy, and risky process. The developer should be encouraged by the prospect of a secure federal trademark registration as long as reasonable progress is made toward commercial marketing. To honor token sales in such situations furthers the purpose of the Lanham Act. The Report of the Committee on Patents stated as one of the purposes of the legislation:

> [W]here the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

Senate Committee on Patents, Providing for the Registration and Protection of Trade-Marks Used in Commerce, S.Rep. No. 1333, 79th Cong.2d Sess. 3 (1946).

■ The $2.52 token sale had all the "color" of a bona fide sale. Although plaintiffs' failure to develop the product for over two years strains the outer limits of the liberal policy on token sales, the hiatus was followed by substantial activity. I find it to be a valid sale.

C. *Abandonment.*

■ Unlike copyrights and patent rights, trademark rights exist only as an appurtenance to the business in which they are used. As the Supreme Court said in *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918):

> The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

Activities designed merely to prevent use of the mark by others do not protect it. *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d at 100–01. Activities of the plaintiffs in this case to protect the right to use their YOCREME mark[4] are not evidence of intent to use the mark. A mark will be deemed abandoned through non-use unless intent to use is proved. As noted earlier, the Lanham Act specifies that intent not to use[5] may be inferred from circumstances, and that non-use for two consecutive years shall be deemed prima facie evidence of abandonment. 15 U.S.C. § 1127. The proper inquiry is not whether plaintiffs did not intend to abandon the mark, but whether defendants proved by a

---

4. Plaintiffs' 1979 acquisition of the name from a small Maryland retailer, and its 1981 agreement with Land O' Lakes whereby that company abandoned its use of the name are activities of this nature.

5. For sake of clarity, I refer to defendants' need to prove "intent to use" rather than the statutory term of "intent to resume use" because in this case there was no commercially significant but only token prior use.

preponderance that plaintiffs did not intend to use the mark in a commercially meaningful manner. *AmBrit, Inc. v. Kraft, Inc.,* 805 ꓺ.2d at 994; *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F.2d at 102.

The liberal doctrine honoring token sales as sufficient use to register a mark does not extend to honoring mere token use to sustain the mark against a charge of non-use. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271, 181 U.S.P.Q. 545 (2d Cir.1974). To prove bona fide usage, the trademark holder must demonstrate that the use of the mark has been "deliberate and continuous, not sporadic, casual or transitory." *Id.* 495 F.2d at 1272.

Although abandonment must always be proved by a preponderance of the evidence, some cases differentiate between those in which the registrant previously used the mark, and those in which it was not so used. *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1060, 225 U.S.P.Q. 797 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). If the mark was previously used in a commercially significant way, the registrant may show plans to reintroduce the mark as evidence of intent to resume use, especially if the court determines that a residue of consumer goodwill toward the mark exists despite the erosion of time. It was in such a factual context that the Appeals Board stated that any doubt should generally be resolved against an inference of abandonment. *Oland's Breweries (1971) Ltd. v. Miller Brewing Co.,* 189 U.S.P.Q. at 488. The cases are less generous when essentially no prior goodwill had been established, as in *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d at 1271–72, where the court held that to avoid an abandonment, the trademark holder's use of the mark must be deliberate and continuous, not sporadic, casual, or transitory.

In this case no goodwill toward YOCREME existed prior to its 1986 intro-

duction to the marketplace. Nevertheless, plaintiffs' intent need not be shown in the form of sales. Development of the product, packaging, design, or advertising plans are evidence of intent to use. *Brawn of California v. Jojoba Products Co., Inc.,* 211 U.S.P.A. 881, 883 (S.D.Cal.1980). When it reasonably takes a considerable period of time to develop, perfect, and market a product, evidence of intent to use is proved by a reasonable constancy of effort in the product's development. *General Mills, Inc. v. Frito-Lay, Inc.,* 176 U.S.P.Q. 148 (T.T.A.B.1972).

Plaintiffs admit that following the October 1979 sale, no products associated with the YOCREME mark were tested or developed in any way until April 1982. This constitutes prima facie evidence of abandonment under 15 U.S.C. § 1127, which may be rebutted by showing that circumstances do not justify the inference of intent not to use. *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F.2d at 99.[6] The mere lapse of time does not of itself necessarily destroy the right to the mark. In *Beech-Nut Co. v. Lorillard Co.,* 273 U.S. 629, 633, 47 S.Ct. 481, 482, 71 L.Ed. 810 (1926), the Supreme Court held that where the mark had been extensively used and then allowed to lapse for four years, the lapse did not constitute abandonment in light of the mark-holder's intent to resume use. Where no prior use was made of the mark, but rather a token sale was made followed by development of the product, the registrant is required to show

> activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade.

*Signature Guardian Systems, Inc. v. Lee,* 209 U.S.P.Q. 81, 86 (1980).

Bruce Becker, director of strategic analysis for General Mills, testified that it typically takes two years, or possibly as long as three years, to introduce this type of

---

**6.** Some courts have stated this as a requirement of "justifiable excuse for the lack of commercial activity" when the two-year period of non-use is exceeded. *E.I. du Pont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 813 (T.T.A.B. 1978).

product on a national scale. Thus plaintiffs had no specific plans for YOCREME for the entire length of time it would have been reasonable for them to develop and introduce the product. Plaintiffs argue that, during the critical period of 1979 through 1982, two other projects absorbed their attention: the custard-style yogurt, which was introduced in June 1981, and the breakfast yogurt, which was introduced in June 1982. The YOCREME mark had been ruled out for the custard product and was considered inappropriate for the breakfast product. Plaintiffs contend that they would have been ill-advised to introduce a third product during this period because the company would end up replacing its own products in the limited available refrigerated supermarket shelf space. Even if, for the moment, this argument were entertained as a plausible excuse, by their own rationale plaintiffs could have introduced YOCREME by June 1983. However, the product that eventually became YOCREME was unknown to plaintiffs' own laboratories until 1984.

Plaintiffs' state of mind is indicated by a telex from Yoplait USA, to SODIMA in August 1979 in which the American firm requested the French company to register the YOCREME trademark in the United States. The telex stated: "Yoplait USA *plans to consider the use of this name* for the line of French creme desserts currently being developed." (Emphasis added.) At least four years passed while plaintiffs "planned to consider" using YOCREME and before they actually decided to use it.

In May, June, and July 1982, the YOCREME name was considered for two products, a non-yogurt soft cheese and a non-yogurt "natural pudding" oriented toward children. YOCREME was considered among many other names for the purpose of developing the right name for the products. YOCREME was never further considered in relation to either of these products. Neither of them was ever marketed.

In late 1982, one of plaintiffs' competitors introduced a fruit-on-the-bottom yogurt product. In response, Yoplait USA revived its earlier work on this idea and developed a similar product. In April and May 1983, plaintiffs considered YOCREME in several taste tests for a high-butterfat fruit-on-the-bottom product. When market tests in the summer or fall of 1983 showed insufficient sales for the richer product, they dropped the name and the butterfat content, and proceeded with a more "mainstream" fruit-on-the-bottom product. By the end of 1983, plaintiffs were not working on any projects bearing the YOCREME name.

In early 1984 plaintiffs developed a formula for a high fat yogurt, which apparently was a new concept based upon similar German and Swiss yogurts. The YOCREME product as eventually marketed was based upon this idea. In May 1984, the YOCREME name was assigned to the new product. At this point over four and one-half years had passed since the 1979 sale. By December 1984, plaintiffs made YOCREME a top priority project. In June 1986, plaintiffs filed this action. YOCREME began to be sold in grocery stores in July 1986, slightly more than two years after the project began and almost seven years after the 1979 sale.

Once a mark is abandoned, subsequent use does not retroactively cure its past abandonment. *AmBrit, Inc. v. Kraft, Inc.,* 805 F.2d at 994. A court may cancel a mark because of abandonment even after the registrant has resumed use. In *AmBrit,* the trademark holder failed to use the mark for 48 years, and then resumed extensive use. During the interim, however, a competitor used a similar mark in commerce. The court upheld the competitor's use and cancelled the trademark, examining the evidence as of the time of the competitor's first use or when the competitor might have brought a cancellation suit. *Id.* at 994. In this case the period of non-use is shorter but the principle is the same. I must examine the evidence of plaintiff's intent to use as of late 1982 or 1983, the time the defendants first used their competing mark in commerce or might have challenged the YOCREME mark on grounds of abandonment.

■ By late 1982 or 1983, defendants had been marketing YOCREAM for more than a year. More than three years had passed since the 1979 sale. Plaintiffs could easily have gone into the national marketplace in the interim, but they did nothing until May 1982. Between May 1982 and the end of 1983, they considered the use of YOCREME for three different products. By the end of 1983, plaintiffs were not considering YOCREME for anything.

I find that plaintiffs had no unequivocal intention to use the mark until well after 1983. In October 1983, defendants learned of the existence of SODIMA's registration of the YOCREME mark. In January 1984, Terry Lusetti, an employee of defendants, telephoned Richard Berman, in-house trademark counsel for General Mills, to inquire about plaintiffs' use and intentions for the mark. Mr. Lusetti testified and his notes confirm that Mr. Berman stated that plaintiffs were not using the mark but were "interested" in it. Mr. Lusetti inquired about purchasing the mark. He was told that defendants could make an offer. Mr. Berman does not remember the call. In June 1985, defendants placed a second call to Mr. Berman, this time from Mr. John Hanna, chief executive officer of defendant International Yogurt and secretary-treasurer of defendant Global Gourmet. By that time plaintiffs were actively developing YOCREME. Mr. Berman indicated that the product was being worked on, that the mark was "very much of interest" to plaintiffs, but that no large-scale marketing had yet taken place.

When the clock is turned back it becomes apparent that the evidence does not support an inference of intent to use. Plaintiffs liked the mark, but made no decision to use it until at least four and one-half years, and probably longer, after the 1979 sale. The Lanham Act does not demand either great speed or absolute certitude by a trademark holder. But such prolonged indecision as displayed here, where the mark was but one of a stable full of names to bear the product on its commercial career, cannot constitute intent to use. When there is no intent to use, the mark is deemed abandoned. 15 U.S.C. § 1127.

Plaintiffs' subsequent commercial use cannot retroactively cure a cancellation of a trademark. *AmBrit, Inc. v. Kraft, Inc.,* 805 F.2d at 994.

### D. *Warehousing.*

■ It is also my finding that for a period of at least four and one-half years, plaintiffs had only the vaguest notion of the kind of product that YOCREME represented. They registered the mark for four broad categories of food—yogurt, frozen yogurt, refrigerated dessert, and soft cheese. YOCREME was but one of a stable full of steeds held in readiness to bear the next new product on its commercial career. YOCREME was not reserved for any particular product. Over a period of almost five years YOCREME was tried out on a custard-style yogurt, a soft cheese, a pudding, and a fruit-on-the-bottom style yogurt before finally being selected for the high-fat yogurt concept—a concept unknown to plaintiffs at the time of the 1979 sale.

A product as eventually marketed need not be identical to that which was registered. For example, in *Fast Chemical Products Corp. v. Pillsbury Co.,* 132 U.S.P.Q. 561, 562 (T.T.A.B.1962), the trademark holder discontinued sale of a powder laundry detergent and substituted a liquid all-purpose cleaner. The Appeal Board held that it will not cancel a mark because of a mere change of formulae or primary use. Similarly, in *E.I. du Pont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 813 (T.T.A.B.1978), the trademark challenger, who claimed an earlier date of use of the same name as the markholder, sold its premium washable waterbase paint in a test market and registered the mark on the basis of those sales. When its test market yielded less than desirable results, the challenger omitted one ingredient from the formula and marketed it as a budget paint. The markholder contended that the earlier use date could not be tacked because the products were different. The Appeal Board held that the products were sufficiently similar to support trademark rights.

Introducing a product on a national scale is an expensive and risky project, and certainly courts will accommodate significant modifications of the original product concept. In *Ralston-Purina Co. v. On-Cor Frozen Foods, Inc.*, 746 F.2d 801, 804–05, 223 U.S.P.Q. 979 (Fed.Cir.1984), the court held that the trademark registration was not void when a pet food manufacturer had used one of the products already existing in its line as the basis for the initial token sale, when the new product was still being developed. The court cited approvingly the following statement from Leitten, *Establishing and Protecting Trademarks: A Look at Token Use*, U.S.T.A. Executive Newsletter No. 41 (1983):

> If the product which will be offered commercially is available, then that product should be involved in the initial sale. It can be expected, however, that in most instances the specific new commercial product will still be in the development stage at the time the trademark for the new product is selected. After all, the entire token use doctrine was developed to deal with the gap which arises between mark selection and final product commercialization. Therefore, when the final product form has not yet been developed or if development is ongoing, care should be taken to use a product (*i.e.*, the current prototype) or to select the closest available product in the company's present line.

Nevertheless, the product must be something more than a vague concept at the time of the initial sale. It must actually exist. In *Richardson-Vicks, Inc. v. Franklin Mint Corp.*, 216 U.S.P.Q. 989, 991–92 (T.T.A.B.1982), the Appeal Board denied trademark rights to an applicant for a women's skin care product when the applicant had no specific product in mind but only a vague concept. Similarly in *CPC International, Inc. v. Seven-Up Co.*, 218 U.S.P.Q. 379, 381 (T.T.A.B.1983), the Appeal Board found that the applicant had no definite plans to use the mark for a specific product. The test in all these cases is whether the goods bear the inherent and identifiable character of the product initially sold. *Ralston-Purina Co. v. On-Cor Frozen Foods, Inc.*, 746 F.2d at 805.

In this case, plaintiffs hoped that one of the four products for which the product was registered would be sufficiently similar to YOCREME as it was eventually marketed. I find that YOCREME does not have the inherent and identifiable characteristics of soft cheese. Nor is YOCREME, which is refrigerated but not frozen, sufficiently similar to frozen yogurt. Nor is the high-butterfat YOCREME, which is marketed as an extravagant dessert with exotic flavors, inherently identifiable from plain yogurt. It may be that YOCREME is inherently identifiable from plaintiffs' 1979 sale of chocolate mousse, although this is somewhat doubtful because mousse is a non-yogurt product.

Herein lies plaintiffs' fatal flaw. The smorgasbord for which they registered YOCREME is strong evidence of their uncertainty. They did not know, except in a most general way, how they intended to use the trademark. An application based on initial use must reasonably target the specific product. *La Maur Inc. v. International Pharmaceutical Corp.*, 199 U.S.P.Q. 612 (T.T.A.B.1978). The scattershot approach smacks of improper "warehousing." Although plaintiffs here did not systematically attempt to maintain the trademark without using it, as in *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1206, 205 U.S.P.Q. 697 (S.D.N.Y.1979), they nevertheless attempted to secure rights to a mark without intent to use it on an identifiable product. Trademarks are intended to be the essence of competition,[7] not the means to hoard a good name.

### E. *Common Law Trademark Rights.*

Because plaintiffs' federal trademark for YOCREME fails, and defendants have no federal trademark rights in YOCREAM or 800–YO CREAM, their

---

7. One of the purposes of trademarks is to foster fair competition. Senate Committee on Patents, Providing for the Registration and Protection of Trade-Marks Used in Commerce, S.Rep. No. 1333, 79th Cong. 2d Sess. 4 (1946).

respective rights to use these confusingly similar marks must be determined according to common law.[8] The use in commerce required for obtaining a federal registration is generally congruous with the required use of a mark for obtaining ownership under the common law. 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 16:5, at 773, § 19:4, at 881 (2d ed. 1984). Common law rights are acquired through priority of bona fide use under the common law in each state. *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d at 1472. Transportation in commerce generally constitutes a "use" without a sale as long as the use is "open and notorious" and before potential customers. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 U.S.P.Q. at 765; *cf. Blue Bell, Inc. v. Farah Manufacturing Co., Inc.*, 508 F.2d at 1265. Shipment to various states without actual sale can be sufficient use in commerce. *Ideal Toy Corp. v. Cameo Exclusive Products, Inc.*, 170 U.S.P.Q. 596 (T.T.A.B.1971). Indeed, under the common law, pre-sales publicity or sales solicitation using the mark with intent to continue use, without actual sales, may suffice to establish rights. In *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630, 207 U.S.P.Q. 89 (2d Cir. 1980), where a third-party abandoned a mark, the competing parties shipped their respective sweaters in commerce one day apart. The court refused to call it a horse race, declaring instead that priority is not established solely "in its calendar sense" but on the basis of "the equities involved." *See also* 3 Callmann, *Unfair Competition, Trademarks and Monopolies,* § 19.18 at 42 (4th ed. 1987).

 As unseemly as it may appear, this case is a horse race. The equities do not tilt in favor of either party. Defendants early discovered plaintiffs' federal YO-CREME registration, yet took a risk in proceeding to market YOCREAM. Plaintiffs, for their part, attempted to corral the YOCREME mark with only the vaguest notion of how it might be used, and then let it languish for years. Although plaintiffs invested by far the greatest sum in product preparation, that fact cannot be of any weight when both parties aggressively promoted their product.

Where, as here, marketing involves sales demonstrations to distributors, priority need not depend solely on who gets to the consumer first, as long as there is bona fide shipment or activity reflecting an effort to create a viable business. *La Maur Inc. v. International Pharmaceutical Corp.*, 199 U.S.P.Q. at 617. Plaintiffs' presentations of YOCREME to the trade occurred between May 19, 1986, and July 21, 1986. Actual shipments occurred about eight weeks following the initial sales presentation. By July 1986, the presentations and sales occurred nationally. By the end of August 1986, the product was distributed on the retail level to two-thirds of the country. The product was sold nationally at the retail level by September 1986.

Defendants began selling YOCREAM much earlier but never achieved full national distribution. The evidence establishes that defendants achieved at least minimal sales prior to June 1986, in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Kansas, Kentucky, Maryland, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, Oklahoma, Oregon, Tennessee, Utah, Washington, and Wisconsin.

In addition, defendants made several major presentations sufficient to constitute use in commerce in May and June 1986, to food chains that distribute throughout the six New England states and New York. Plaintiffs began their presentations to the trade in New England on June 2, 1986, and in New York on June 12, 1986. I hold that defendants' activities in Maine, Vermont, New Hampshire, Rhode Island, Massachusetts, Connecticut, and New York were sufficiently substantial to establish priority.

---

8. Trademark rights under a federal registration and under state common law rights stand independently of each other; common law rights may exist on a state-by-state basis even though the federal mark fails. 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 19:4, at 880–81 (2d ed. 1984).

Defendants also produced evidence of shipment of samples or sales solicitations, or both, in Illinois, Louisiana, Michigan, Nebraska, Texas, and Wyoming prior to plaintiffs' introduction of YOCREME. In no instance were the shipments or sales substantial enough or followed by significant activity sufficient to establish priority for defendants.

In Virginia, defendants shipped samples to two potential customers on the same day that plaintiffs began sales presentations. However, there is no evidence that defendants' shipments were followed by any further activity in that state. I hold that plaintiffs established priority.

Plaintiffs established common law priority in all other states.

## CONCLUSION

Plaintiffs' claims for trademark infringement, unfair competition, and injunctive relief are denied. Plaintiff SODIMA's federal trademark registration No. 1,186,981 for YOCREME is cancelled. The parties established common law trademark rights in the states indicated above. The foregoing constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).